JOHN LAMBROS *v.* J. PAUL COOLAHAN
CHARLES CRANE, ET AL. *v.* JOHN LAMBROS

[Nos. 48 and 49, October Term, 1945.]

*Decided December 18, 1945.*

The causes were argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*J. Britain Winter,* with whom was *Harry E. Silverwood* on the brief, for John Lambros.

*James O. Scrimger* for J. Paul Coolahan.

*Arthur S. Padgett,* with whom were *Samuel J. Aaron* and *Howard L. Aaron* on the brief, for Charles Crane and another.

MARKELL, J., delivered the opinion of the Court.

In March, 1944, Lambros (appellant in No. 48, appellee in No. 49, defendant in both) conducted a restaurant and liquor business at the corner of Liberty Heights and Garrison Avenues. He advertised the business for sale. Coolahan (plaintiff and appellee in No. 48) is a lawyer and real estate broker. Crane (Crane & Crane, plaintiffs and appellants in No. 49) is a real estate broker.

Coolahan had lived in the neighborhood, had been a customer of the store, knew Lambros by sight, but had had no real estate transactions with him. Crane had known Lambros for years, had done business with him and had just sold him a drug store on St. Paul Street.

The first week in April, Lambros authorized Coolahan, on a non-exclusive basis, to sell the business for $25,000 plus inventory (said to be $20,000). Lambros says the commission was to be 5 per cent. on the $25,000 with no commission on inventory. Coolahan say he was to receive the regular Real Estate Board commissions (10 per cent. on the first $5,000, 5 per cent. on the excess) on both business and stock, but later agreed upon two-thirds of the full rate on stock. About the same time Lambros authorized Crane, on a non-exclusive basis, to sell the business for $25,000 plus inventory, for a commission of 5 per cent. on the business only.

Coolahan advertised the business in Baltimore and Washington papers, received twenty or twenty-five answers, and took about fifteen "prospects" to Lambros. On April 10th he received a letter from Dr. Charles Flom, of East Baltimore. On April 12th he went to see Flom at his office on Eastern Avenue. Flom told Coolahan he could not have his name enter into the transaction, that it would not look right for a doctor to be taking part in business, but that he and a relative and a group of people were interested definitely in purchasing it. On April 19th Coolahan again went to see Flom. Flom then said he had talked the matter over with a relative and a group of persons interested, but that due to war conditions he would not be interested nor would they. Coolahan says he told Lambros about Flom and what Flom had said. Lambros says Coolahan never gave him Flom's name.

About the middle of April, Crane sent Samuel Flom (a cousin of Dr. Flom) to Lambros. On May 15th Lambros and Samuel Flom signed a contract of sale, which was consummated on June 1st. The fixtures were sold for $19,500, the inventory, good will and licenses, including the lease, for $12,000.

On May 16th Coolahan went into the store to get a sandwich. He saw Lambros, Dr. Flom, a man named Strickos, and a man later identified as Samuel Flom, at the cash register. Dr. Flom, after whispering something to Samuel, ran out the side door. Coolahan said to Lambros, "I told you Dr. Flom and the people he was representing were prospects of mine." Coolahan says Lambros replied, "Sure enough, but you didn't bring him." A few days later Lambros told Coolahan he had taken back a couple of thousand dollars worth of novelties, and gotten a little better than $45,000. After May 16th Coolahan saw Dr. Flom quite frequently at the store.

Dr. Flom says he did not tell Samuel about the business being for sale; he learned through his broker that Samuel had purchased the business. At the time of the purchase, the Floms testify, Dr. Flom and Strickos had no interest in it; about thirty days later they both contributed some money, but the proposed agreement with them was never consummated, and they got their money back. Dr. Flom says the relative he had in mind when he talked with Coolahan was his brother-in-law, named Shapiro.

Coolahan and Crane each claimed commissions, Coolahan $2,166.67 on $45,000, Crane $975 on $19,500. Each sued Lambros. Both cases were tried together before the same jury. In No. 48, the verdict was for Coolahan for $1,625, full commissions on $19,500 and two-thirds commissions on $12,000. In No. 49 the verdict was for Lambros against Crane. In No. 48 Lambros's motion for a directed verdict was refused; his motion for judgment *n. o. v.* was also refused. Lambros admits that he owes commissions to Coolahan or Crane, not to both. He consents that if the judgment in No. 48 is reversed and a judgment entered for him, the judgment in No. 49 be reversed and a judgment entered for Crane for $975. At the argument Crane also conceded that if the judgment in No. 48 is affirmed, the judgment in No. 49 should be affirmed.

On these appeals, therefore, the only question presented (by the motions for a directed verdict and for judgment *n. o. v.*) is whether there is any evidence legally sufficient to show that Coolahan's efforts were the procuring cause of the sale to Samuel Flom. For the purpose of this question, we have (where the testimony is conflicting) stated the version of the facts which is most favorable to Coolahan.

Coolahan contends that the evidence is sufficient to permit a rational conclusion that the negotiations between him and Dr. Flom were not broken off in good faith but that the two Floms connived with Lambros to prevent Coolahan from completing the negotiations and obtaining his commissions, and thereby to save Lambros the difference between Coolahan's commissions and Crane's commission. The testimony of Lambros and the two Floms may suggest suspicion and may be disbelieved by the jury. The question remains whether disbelief in this testimony supplies the lack of any direct evidence of any connection between the Floms before the sale. This question we do not find it necessary to decide.

In addition to the evidence we have mentioned, a real estate broker, named Greenblatt, testified that: During April, 1944, he had business dealings with Lambros. He often saw Lambros at the store. Lambros wanted to sell the store. Greenblatt "showed him an exclusive contract of sale." Lambros said, "No, a broker has it, and I can't give it to you." Greenblatt "asked him who it was, and he said he wouldn't tell me. * * * I asked him again after the store had been sold, would he care to give it to me, and he said, No; I said, 'Well, tell me the broker and probably I can work through him, we have an arrangement whereby we can divide the commission,' and he said, 'There he is over there'," pointing to Coolahan. Shortly afterwards Lambros introduced Greenblatt to Samuel Flom. Later, or at the time, Greenblatt said to Lambros, "Is it really sold, have you signed up?" Lambros said, "Yes." Greenblatt said, "Who put it over?" Lambros either pointed to Coolahan or said

"Coolahan." Lambros denies that he told Greenblatt Coolahan was the man who put the deal over; he admits he had a conversation with Greenblatt after the store was sold and introduced Greenblatt to Samuel Flom.

The weight and credibility of Greenblatt's testimony was a question for the jury. If his testimony is true, Lambros said that Coolahan effected the sale. This is a statement of fact which might be within Lambros's knowledge. It is none the less a statement of fact because it is a statement of an ultimate fact and not of details. It is legally sufficient to take the case to the jury.

As Wigmore says, "there is a general distrust of testimony reporting any extra judicial oral statements alleged to have been made, including a party's admissions." *Wigmore on Evidence,* 3rd Ed., Sec. 1056. In criminal cases, divorce cases, and cases of proof of certain facts, *e. g.,* marriage, the admissibility or the sufficiency of admissions, as evidence, is limited by rules of evidence or by statute. *Wigmore,* Secs. 1055, 2094. *Cf. Schmeizl v. Schmeizl,* 184 Md. 584, 42 A. 2d 106; *Schriver v. Schriver,* 185 Md. 227, 44 A. 2d 479. Subject to these limitations, which are not applicable in this case, oral admissions of a party "are universally deemed admissible" and legally sufficient to prove facts admitted. *Wigmore,* Secs. 1048, 2075.

*Judgments affirmed, with costs.*