## MARYLAND STATE FAIR, INC., *v.* AGNES HENDERSON.

[No. 25, January Term, 1933.]

*Decided April 20th, 1933.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*A. T. Brady* and *Albert Jerome Goodman,* for the appellant.

*Charles C. Marbury,* with whom was *T. Howard Duckett* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

This is an appeal from a judgment recovered by the appellee, Agnes Henderson, against the Maryland State Fair, Inc., for alleged injuries from a fall caused by stepping on, and her foot becoming entangled in, a piece of wire, while attending the races at the appellant's fair grounds on the 7th of October, 1930.

The declaration alleges: "That the defendant did not keep its said race track, including the grounds used in connection therewith reserved for the use of the public in going to and from said races, free from refuse and litter and in a safe condition, but the defendant, not mindful of its duty in the premises * * * negligently and carelessly suffered and permitted said grounds to become littered with a piece of wire, and to be dangerous, and failed to use due care in not removing the same; and for that while the plaintiff, on the day aforesaid, was in the act of leaving said race track and while on the grounds thereof adjacent thereto reserved for the use of the public * * * and while the plaintiff was using due care and was without fault or negligence on her part, the plaintiff stepped into said piece of wire, causing her to trip, fall and be thrown heavily to the ground."

At the conclusion of all the evidence heard at the trial, the plaintiff was granted four of the five prayers that were asked for by her. The defendant asked for six prayers. Of these, the first, fourth, and fifth were rejected, while the second, third, and sixth were granted. The defendant excepted to the action of the court in granting the plaintiff's second prayer, and in rejecting the defendant's first, fourth, and fifth prayers.

The defendant's first prayer was a demurrer to the evidence. This, as we have said, was refused by the court. The rulings of the court on this prayer will be first considered by us, and, should we find that the court wrongfully refused this prayer, we need not consider the court's action in granting the plaintiff's second and rejecting the defendant's fourth and fifth prayers.

The contention of the defendant is that there was no evidence legally sufficient to go to the jury showing negligence on the part of the defendant causing the injury complained of. It is not contended by the plaintiff, nor is it shown from the evidence, that the wire over which the plaintiff tripped and fell was placed there by the defendant or any of its agents or employees, or that its existence there was known to them. On the contrary, it is shown by the evidence of the plaintiff that the wire was placed or thrown there by one of the newsboys after it had been removed by him from a bundle of papers, which were delivered by a truck to be sold on the fair grounds. These papers, as shown by the evidence, arrived at the grounds when the races were about over.

The plaintiff testified that "after the last race" she, together with Mr. Beaumet and Mr. Smith (with whom she had gone to the races), "proceeded to leave the grand stand" and "hurried to catch the train" for Washington. "They were going out at the end of the shed and, just as she stepped down, Beaumet and Smith in front of her, she stepped into this wire" which caused her to fall. The evidence is not clear and specific as to the location of the wire. From the evidence offered, it would seem that it was, at the time of the accident, on a roadway used by trucks and automobiles coming into the fairgrounds, at the place where the trucks delivered the newspapers. This roadway was one or two steps down from the concrete walk from which the plaintiff says she stepped to the roadway. The concrete walk was rather narrow, and at times the people attending the races, in their hurry to get to the train, as in this case, and being unable to get through the crowd in front of them on the walk, would step down onto the roadway to enable them to reach the train more quickly. The exact time between the arrival of the newspapers at the fairgrounds and the moment of the accident is not shown by the evidence, but it was only a short time.

Upon cross-examination the plaintiff testified that "at the time of the accident there was quite a rush and people seemed

590

to be in a hurry; she was in a hurry too; did not want to be left out there; didn't have any money to get home on." She further testified that "if she had been looking for the wire she guessed she could have seen it * * * she was in a hurry to get the train and was not thinking anything like that would be there; knew where the step was; was looking for it but was not expecting the wire to be there." It was first shown to her after the accident.

Mr. Beaumet testified that he, along with Mrs. Henderson and Mr. Smith, on the 7th of October, 1930, the first day of the races, went to the race track on the defendant's grounds, and the three remained together; "that after the last race Mrs. Henderson and Mr. Smith and he were leaving the grand stand together, probably a few inches apart, and as they had reached a point where they had stepped off the long walk and had gotten near the end, 'we stepped off to the left side, this one fairly high step, and after that made two or three more steps and all of a sudden she stepped forward and she stepped on this wire, covered by a newspaper, just a piece of paper, she stepped down with her left foot and the paper came up with the wire, or the wire came up with the paper * * * and as she made another step she threw herself, this wire was practically in a circle and caught her foot and she tripped herself and fell * * * she went so fast we could not catch her, she went down very hard and slid.' " The witness was asked if he knew where this piece of wire came from, to which he replied: "There was a young man selling newspapers right off to the left of that and he admitted that he had left it there. They have a big stack of papers and an extra piece of paper and with that wire wrapped around it, he ripped it off and threw it over there, and this newspaper boy and some of the people admitted that right near there." Mr. Beaumet was then asked: "Have you ever seen any wire like this at any other time at this same location?" An objection was made to this question, but the witness was permitted to answer subject to exception. His answer was: "I did, two or three days later." This answer, however, with similar answers by

Mr. Smith and Mr. Cranford, was later stricken from the evidence.

Mr. Smith, who was with the plaintiff and Mr. Beaumet, testified that he saw the plaintiff fall, and when asked, 'Did you notice what, if anything, caused her to fall?" he said, "Yes, a piece of wire, tangled up around her foot just as she fell. Q. When did you first see this piece of wire? A. Just when she fell, as she was falling you could see something the matter with her feet. * * * I took it off her foot and gave it to Mrs. Henderson."

Mortimer Cranford, a farmer living at Upper Marlboro, Maryland, a witness for the plaintiff, testified that it was customary for the trucks delivering the newspapers to unload them near the location above mentioned. He was then asked: "When did you first notice the unloading of newspapers there?" He replied: "I could not say exactly, three or four years ago." "Q. Can you say whether you noticed it during the meet of 1929? A. I guess I did, I was there off and on and lots of times I come out and go to the stables. * * * Q. What would they be, a package? A. Some fellow grabs them and puts them on the cement and unties them and gives so many to each boy. Q. How bound in packages? A. It was bound with wire at one time. Q. Directing your atten-ion to the meet of 1930, can you state whether or not you remember how they were bound at that time? A. I think bound with wire at that time. * * * Q. What kind of wire were they bound with? A. I did not pay any attention to it. * * * Q. State whether or not it appeared to be copper wire? A. I never paid that much attention to it, but it was wire * * *. It was very small * * *. It looked about that size. * * * Q. Do you know what they did with the wire that bound the packages? A. No, I don't * * *. I have seen it laying in the road. Q. Do you remember seeing it in the fall of 1929? A. I would not be positive about that.".

This witness had little or no definite knowledge as to the wire used, or when it was used. He did not know what was done with the wire when taken from the bundle of papers, though he had seen it, as he states, lying in the road. He

could not say that he saw it in the road in 1929; and he could not say at what time or in what year he saw it there.

This evidence, we think, is legally insufficient as tending to show that the papers were wrapped with wire at any time earlier than the day of the accident in 1930; and there is no evidence tending to show that the defendant or its agents, at any time prior thereto, knew or could have known, by the exercise of reasonable care, in time to avoid the accident, that the wire was used in wrapping the papers, and that it was disposed of thereafter in the manner stated. The evidence of the defendant shows that there were about fifteen men employed by the defendant company, whose duty it was to keep the grounds clean, and that these men went over the grounds daily picking up all papers and other litter found thereon.

Mr. Dickerson, the superintendent of the defendant association, a witness produced by the defendant, testified that he made a general inspection of the work done each day by the employees to see that everything was done in accordance with the orders from him. He stated that on the day of the accident these men were engaged in the performance of their duties at and about the place where the accident occurred; that the last meet prior to the day of the accident was in the fall of 1929; that the papers mentioned were thrown off, not by the employees of the defendant association; but by the men in charge of the newsboys, and were thrown off at different places. The witness further stated that wire was not used in wrapping the bundles of papers before 1930; prior to that time the papers were wrapped with twine. Wire was used for the first time on the day of the accident, which was the first day of the races in 1930.

Negligence is the gravamen of this action, and the negligence here relied on is the alleged failure of the defendant to keep its grounds and premises free from refuse and litter, including the wire over which the plaintiff tripped and fell, causing the injury complained of.

The defendant was not the insurer of the safety of the plaintiff while upon its premises and grounds, but it owed to her the duty of exercising ordinary care to see that the

place to which she was invited was in such condition as not to imperil her, so long as she herself exercised ordinary care. *Hochschild, Kohn & Co. v. Murdoch,* 154 Md. 575, 141 A. 905; *Isaac Benesch & Sons v. Ferkler,* 153 Md. 683, 139 A. 557; 58 *A. L. R.* 136; 33 *A. L. R.* 181; 45 *C. J.* 814, 826. And as said by Judge Offutt, speaking for this court in *Dickey v. Hochschild, Kohn & Co.,* 157 Md. 450, 146 A. 282, 283: "Any breach of that duty, resulting in injury to the invitee, will constitute actionable negligence. But as actionable negligence is a relative and not an absolute term, whether it exists in a given case must depend upon the facts and circumstances from which it is sought to be inferred. *Benedick v. Potts,* 88 Md. 55, 40 A. 1067; *Geiselman v. Schmidt,* 106 Md. 584, 68 A. 202; *Schell v. United Rwys. Co.,* 144 Md. 531, 125 A. 158." See *Strasburger v. Vogel,* 103 Md. 85, 63 A. 202; *Regent Realty Co. v. Ford,* 157 Md. 514, 146 A. 457.

As the doctrine of *res ipsa loquitur* does not apply to the facts of this case, it was essential that the plaintiff should show failure upon the part of the defendant to exercise reasonable or ordinary care for her safety. The mere presence of the wire upon the concrete roadway, over which the plaintiff fell and was injured, and no more, does not show such negligence. The wire was not placed or left there by any employee of the defendant, and it was necessary for the plaintiff to prove that the defendant knew, or by the exercise of ordinary care could have known, of its presence on the roadway in time to have prevented the accident; or, in other words, that the wire had remained thereon sufficiently long to charge the defendant with constructive notice of its presence. *Gorman v. Simon Brahm's Sons, Inc.,* 298 Pa. 142, 148 A. 40; *Tenbrink v. F. W. Woolworth* Co. (R. I.), 153 A. 245.

As the record contains no evidence legally sufficient tending to show the existence of such essential facts, the judgment of the trial court will be reversed.

*Judgment reversed, without a new trial; the appellee to pay the costs.*