F. ALBERT CLAUTICE *v.* MARY MURPHY
F. ALBERT CLAUTICE *v.* RUSSELL R. VANE
[Nos. 14 and 15, April Term, 1942.]

*Decided May 26, 1942.*

The cause was argued before BOND, C. J., SLOAN, DELAPLAINE, COLLINS, FORSYTHE, and MARBURY, JJ.

*Foster H. Fanseen* and *Philip S. Ball* for the appellant in both cases.

*John E. Magers*, with whom were *Edelman & Ehudin* on the brief, for the appellee in No. 14.

*Joseph Sherbow*, with whom were *Sherbow, Harris & Benjamin* and *Solomon Liss* on the brief, for the appellee in No. 15.

COLLINS, J., delivered the opinion of the Court.

These cases are the result of a collision at the intersection of Water and Commerce Streets, in Baltimore

City, between a taxicab and a truck, the plaintiff being a passenger in the taxicab, which had the right of way at the intersection.

The defendant, F. Albert Clautice, individually and trading as Hanover Transfer Company, the owner of the truck, appeals from the judgment awarded the appellee, Mary Murphy, and from the judgment entered in favor of Russell R. Vane, individually and trading as Diamond Cab Company, the owner of the taxicab, and both appeals are considered in this opinion.

At the point of the accident, Commerce Street is about forty feet wide and Water Street, a one-way street for eastbound traffic, is about thirty feet in width. An unused single car track is laid along the center of Commerce Street. At about 4.10 P. M. on November 28, 1940, the street being dry and traffic congested, the plaintiff, Mary Murphy, was riding in a taxicab, owned by Vane, in an easterly direction on Water Street. The truck of the appellant, Clautice, was proceeding south on Commerce Street.

The appellee, Mary Murphy, testified that when she was coming down Water Street in the taxicab she saw a green car at the corner of Water and Commerce Streets, hereinafter referred to as the green car, waiting to let the cab go by. The green car was standing still and not making any sort of turn and the driver of the green car let the cab go by, the cab being to the right of that car. The cab driver was going rather fast down Water Street, that she does not drive a car and doesn't know anything about miles per hour nor about speed. As the cab driver started to cross Commerce Street he was almost across the street when the truck came and hit the taxicab. When the truck hit the cab she was thrown up in the air, and when she came down she struck her face against the front seat of the cab and then her body rocked back and forth between the two seats. She landed on the floor in the middle of the cab. She told the driver that she thought her hips were hurt and he came around and picked her up and put her on the seat.

The driver of the taxicab stated that he was going east on Water Street with Miss Murphy as a passenger and slowed down to from five to seven miles an hour in second gear and when he saw the green car stop to let him go by, he continued across the intersection in second gear at a rate of from ten to twelve miles per hour. The green car coming south on Commerce Street stopped to let him go by and that naturally when he stopped to let him go by he went ahead still in second gear. The truck went around the green car, which was stopped, and hit his left rear fender. He didn't see the truck pass around the green car as he wasn't expecting that. He just got a glimpse of the truck before his cab was hit. He was past the car tracks, which ran down the center of Commerce Street, when the accident happened and the front of his cab has reached the east curb line before the cab was hit. He was three-quarters of the way across Commerce Street, almost completely over. He further said that when the truck hit his cab it jarred the rear and shook the passenger, the appellee, out of her seat. When he looked back, Miss Murphy was off the seat and he helped her back and took her to Mercy Hospital, where he waited about an hour or two when appellee was examined and he then took her home.

The truck driver stated that he was driving south on Commerce Street and in front of him was the green car trying to find a parking space. As this could not be found, the green car started to turn up Water Street and after it was found that this was a one-way street, the green car stopped. He then pulled around the green car. When he made the left turn around the green car he was partly on the wrong side of the street. He pulled right out on the left-hand side, partly on the car track, and then hit the taxi on the left rear fender, the taxi being on the track. He further stated that he did not see the cab until he hit it. The green car had stopped when he pulled around it.

562

Six exceptions were taken by the appellant, the sixth being abandoned on appeal. The defendant, Vane, at the end of the case, offered the following prayer: "The court instructs the jury that there is no evidence in this case legally sufficient to entitle the plaintiff to recover against the defendant, Russell R. Vane, and therefore their verdict must be for the defendant, Russell R. Vane." Under Rule Four of Part Three, III, General Rules of Practice and Procedure, adopted by this court pursuant to Chapter 719 of the Acts of 1939, the trial judge reserved his ruling on this prayer and allowed the case to go to the jury. After a verdict was brought in for the plaintiff, the following day the defendant, Vane, under Rule Eight, moved for a judgment N. O. V. and in the alternative moved for a new trial. After a hearing on this motion, the trial judge granted defendant Vane's prayer for a directed verdict and entered a judgment N. O. V. in favor of the defendant, Vane, for costs and refused the motion for a new trial. The action of the trial judge in granting this judgment N. O. V. in favor of Vane for costs constitutes the fifth exception of the appellant and will be first considered by us here.

The first question that arises is whether this prayer is sufficient under Rule Four, *supra*, providing that a motion or prayer for a directed verdict shall state the grounds therefor. In the instant case, there being but one issue of fact to which it could apply, the prayer is sufficient.

Under the provision of the Code, 1939, Art. 56, Sec. 235, as to vehicles approaching an intersection from right to left, Vane's driver of the cab was the favored, Clautice's driver of the truck the unfavored, driver. There is no evidence that the traffic at the intersection was governed by signal lights or any other governing device. The general rule applicable therefore under ordinary circumstances was that all vehicles shall have the right of way over other vehicles approaching at intersection public roads from the left. Article 56, Section 235, *supra; Billotti v. Saval,* 165 Md. 563, 168 A. 890;

*Warner v. Markoe,* 171 Md. 351, 189 A. 260. It appears without doubt that the two drivers came to the intersection in such proximity of time as to require the accommodation of one to the other. Under such circumstances the driver of the taxicab had the right of way over the driver of the truck. *Billotti v. Saval, supra; Jersey Ice Cream Co. v. Bach,* 161 Md. 285, 292, 157 A. 277; *Minch v. Hilkowitz,* 162 Md. 649, 656, 161 A. 164; *Paolini v. Western Mill & Lumber Corp.,* 165 Md. 45, 52, 166 A. 609; *Warner v. Markoe, supra.* Clautice's driver, coming from the left, was required to yield to avoid apparent chances of collision. The driver of the taxicab coming from the right could rightly expect such a yielding. On the other hand, the driver of the truck from the left could rightly expect traffic from the right to be under control and that it would take care to avoid traffic from its own right. If the taxicab came at such a speed in disregard of other traffic, negligence in driving from the left would not constitute an intervening cause superseding such excessive speed. The driver of the taxicab was, of course, under the duty to recognize that drivers from the left will often cross negligently, miscalculating the chances of collision. *United Railways & Electric Co. v. State,* 163 Md. 313, 325, 163 A. 90; *United Railways & Electric Co. v. Crain,* 123 Md. 332, 91 A. 405; *Lange v. Affleck,* 160 Md. 695, 155 A. 150, 79 *A. L. R.* 1274; *Pennsylvania Steel Co. v. Wilkinson,* 107 Md. 574, 581, 69 A. 412, 16 *L. R. A. (N. S.)* 200; 72 *Univ. of Pa. Law Review,* 211, 343; *Torts, Restatement,* Sec. 449; *Warner v. Markoe, supra.* The rule is well stated in the case of *Chiswell v. Nichols,* 137 Md. 291, 306, 112 A. 363, 368, where it is said: "The first and chief thought and care of the driver of a vehicle approaching an intersecting road should be given to those vehicles that might be approaching him from the right, and, for the safety of those using the public roads, too much stress cannot be laid upon the importance of so doing. At the same time the traveler is not, because of the statute, looking to the general safety

and welfare of others as well as himself, altogether relieved of the necessity of observing the condition of the road to his left with a view of ascertaining whether or not the road is clear and free of persons and vehicles approaching from that direction." *Warner v. Markoe, supra; Askin v. Long,* 176 Md. 545, 547, 548, 6 A. 2d 246. The question, although governed by statute, usually is one of fact. *Askin v. Long, supra.* In the instant case the green car had stopped at the intersection almost in the middle of Commerce Street, near the intersection, there being another car parked between it and the curb. The driver of the taxicab seeing the green car stopped was under no duty to assume that the truck would pull around this green car on the left-hand side of Commerce Street practically at the intersection and cross the intersection at that point. This is exactly what the truck driver did, as brought out by all of the testimony. He admits that he did not see the taxicab until he hit it. As the truck came around the parked green car, the driver of the taxicab was not in a position to see it and in fact did not see it until just before his cab was hit. At the time of the collision the taxicab was practically across the intersection, for the truck driver admits that he hit the left rear fender of the taxicab on the car track. The only evidence of any negligence on the part of the taxi driver or that he was not exercising the highest degree of care consistent with the nature of the undertaking or the utmost care and diligence that human foresight can employ is the statement by the appellee, Mary Murphy, that the taxicab was coming rather fast down Water Street. She further stated, however, that she does not drive a car and doesn't know anything about miles per hour nor about speed. This testimony comes from the plaintiff herself. In considering this prayer, we must, of course, view the testimony and all legitimate inferences therefrom in the most favorable light from the plaintiff's standpoint. She does not operate an automobile and did not attempt to give the rate of speed per

hour.   It is impossible from her testimony to say what the speed of the taxicab was other that that in her opinion it was rather fast.   There is no evidence as to what she considered "rather fast."   There is no testimony as to the grinding of brakes or that they were suddenly applied by the cab driver and the uncontradicted evidence is that the taxicab stopped when it was hit a blow only sufficient to mash one-half of the fender. She did not testify that the cab was moving at an excessive rate of speed.   This evidence of the plaintiff was too vague.   *Slaysman v. Gerst,* 159 Md. 292, 298, 150 A. 728.   We, therefore, find no error in the granting of this judgment N. O. V. for the appellee, Vane.

The first exception was taken when the plaintiff, on direct examination, being questioned by her attorney as to the trouble she was having with her back and hips, was asked the following question: "Q. In the night time did you have any trouble with them? A. Yes." The objection raised by the appellant is that this was a leading question.   The next question and answer were as follows: "Q. What effect does that have at night? A. Well, I can't sleep at night time.   I am up more than I am in bed."   No objection was made or exception taken to this second question and answer.   We, therefore, believe that if there was error in allowing the first question to be asked and answered, it was harmless error, as the same matter was admitted in evidence in the following question and answer without objection.

The second objection relates to a hypothetical question asked Dr. Robert W. Johnson, Jr., whose qualifications as a bone specialist were admitted by the defendants. Dr. J. Emory Poulton was called to see the plaintiff the night of the accident and treated her at various times and she was still under his care at the time of the trial and he testified in the case.   On May 1st, about six months after the accident, she went to Dr. Johnson and had been treated by both doctors up until the time of the trial.   Dr. Johnson examined her on May 1st and took a careful history of the case.   He had X-rays taken

of the spine and stated that the film showed a very distinct narrowing of one of the spaces between the vertebrae and also a congenital defect at the base of the spine. He was not present in court during the entire testimony in the case. He also made the following statements: "It is also the sort of injury that we see associated with the type of trauma that she had. Apparently she was thrown forward, doubled up on the floor in the space between the two seats and squeezed together and probably what happened was that the little sac which held this fluid ruptured and the cartilage squashed out; * . * *. Any 'fall where you sit down terrible hard on your buttocks or bend forward; it takes a reasonable hard fall. I have seen them from slipping in a bathtub, foot slipping out on a rug; something like that." The attorney for the plaintiff then stated to Dr. Johnson the material elements of the case and asked him whether or not the injuries which he found were or were not the result of the accident on November 28, 1940. An objection was made to the question and the court sustained it on the theory that there was no testimony to the effect that anything else happened to the plaintiff in the interim. The plaintiff was then recalled to the stand and stated that she had no injury since the accident. The attorney for the plaintiff then continued his question to Dr. Johnson as follows: "I add to the question the further testimony, in addition to the question I have asked, that this lady had had no accident or trouble with her hips or back prior to this accident and after this operation of July prior to November, 1940; she had some female trouble, was operated upon, but never had any trouble with her back or hips that she is complaining of now, and since the accident she hasn't had any injury, accident that otherwise affected those parts. Now, I ask you whether or not this injury which you found was the result of the accident of November 28th, 1940." Another objection was made to the question. The court overruled the objection, to which the second exception is taken and added to the question

asked of Dr. Johnson the following: "The question calls for an expression of opinion, whether, assuming the truth of the facts Mr. Magers has recited, the condition that you found on examination, that is, the narrowing of the capsule between the tenth and eleventh vertebrae, whether that, probably, was the result of the accident referred to." To which question Dr. Johnson answered: "I believe it was due to that injury and only to that injury."

The third exception is taken to the refusal of the trial court to strike out this answer. Appellant objects to the piecemeal method in which this lengthy hypothetical question was propounded to the witness, that the question was not based on the facts in the case, and gave a distorted picture of the accident, was inaccurate and was not stated hypothetically, and that the doctor did not see the patient until six months after the accident. It is true that asking a lengthy hypothetical question in a piecemeal method is objectionable if it is asked in such a way as to confuse the jury as to what the witness was, in the last analysis, supposed to answer. *Thompson v. Standard Wholesale Phosphate Works,* 178 Md. 305, 13 A. 2d 328. However, it does not appear that the piecemeal method in which this question was asked prevented the jury from getting the true purport of the inquiry. As was said in the case of *Northern Central Railroad Co. v. Green,* 112 Md. 487, 505, 76 A. 90, 97: "A hypothetical question must embrace every material element of the hypothesis founded upon the evidence, and it must not import into the question any element not founded upon the evidence in the case. If it offends in either respect, it is defective, and it is error to permit such a question to be answered, and, if inadvertently admitted over an objection, it is error to refuse a motion to strike out the answer." *Baltimore & Ohio R. Co. v. Brooks,* 158 Md. 149, 160, 148 A. 276, 280; *Mathiesen Alkali Works v. Redden,* 177 Md. 560, 565, 10 A. 2d 699. It appears to this court that this question embraced every material element of the hypothesis

founded upon the evidence and there was no element imported into the question which was not founded upon the evidence in the case. The amendment of the question by the court gave it its hypothetical character. *Langerfelder v. Jones,* 178 Md. 421, 13 A. 2d 623, 15 A. 2d 422. It is also pertinent that the only person who knew what happened to the plaintiff at the time of the accident is the plaintiff herself and she is corroborated by the taxi driver when he states that he found her off the seat. Dr. Johnson had attended her for practically five months previous to the trial of the case. This court said in the case of *Langenfelder v. Thompson,* 179 Md. 502, 20 A. 2d 491, 494, 136 *A. L. R.* 960: "But where there is no dispute regarding the nature of the accident and the manner in which the plaintiff was injured, but the sole question is whether a certain condition was the result of the injury, then there is no impropriety in directly asking the attending physician to state what, in his opinion, had caused the condition."

The fourth exception is taken to the overruling of an objection to the following question by plaintiff's attorney: "In her present condition, if left the way it is, can you tell us whether or not that condition is or is not permanent?" To which Dr. Johnson answered: "I believe it is a permanent condition unless it is fixed by operation." Appellant objects on the ground that the declaration makes no claim for permanent injuries, and it was therefore reversible error to allow this last question to be asked. We must note, however, that the doctor testified that he believed it to be permanent unless it was fixed by operation and he further stated in his next answer that he believed that she can be made all right by an operation. We, therefore, do not see the force of this objection.

As we find no error, the judgments in both cases will be affirmed.

*Judgment affirmed in No. 14, with costs.*
*Judgment affirmed in No. 15, with costs.*