# BALTIMORE TRANSIT CO. *v.* JAMES W. WORTH
## [No. 82, October Term, 1946.]

120

122

Decided March 18, 1947.

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, and HENDERSON, JJ.

*Eben J. D. Cross* and *Philip S. Ball* for the appellant.

*Paul Berman* and *Sigmund Levin,* with whom was *Theodore B. Berman* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by the Baltimore Transit Company, defendant below, appellant here, from a judgment in favor of James W. Worth, plaintiff below, appellee here, to his own use and to the use of The Consolidated Gas, Electric Light & Power Company of Baltimore City in the amount of $20,000, entered in the Superior Court of Baltimore City, in a suit for personal injuries.

(1) Appellant contends primarily that there was not legally sufficient evidence of primary negligence on the part of the Baltimore Transit Company or the operator of the streetcar to take the case to the jury and that, therefore, its demurrer prayers and motion for a judgment *non obstante veredicto* should have been granted. Where demurrer prayers are offered, the Court, in deciding whether they should be granted, resolves all conflicts in the evidence in favor of the plaintiff and the truth of all evidence and such inferences as may naturally and legiti-

mately be deduced therefrom which tend to support the plaintiff's right to recovery will be assumed. *Armiger v. Baltimore Transit Co.,* 173 Md. 416, 425 and 426, 196 A. 111. We shall therefore review the evidence in the light most favorable to the appellee in considering the demurrer prayers.

The appellee, Worth, six feet tall, on April 1, 1944, was working in a manhole four and one-half feet deep, located in the east bound traffic lane of Fayette Street, Baltimore City, between Howard Street and Park Avenue, about eight inches south from the southernmost rail of the east bound streetcar tracks. The location is sixty-five feet west of the intersection of Fayette Street and Park Avenue.

Worth was known as an "underground helper." His duty was to go down into the manholes, pull the cables through the conduits, and install them in their proper place against the underground wall. The other members of his immediate crew, all of whom were employees of the Consolidated Gas, Electric Light & Power Company of Baltimore City, were: the foreman, John F. Schmelz, George E. Off, and Joseph Sergi. The duties of Off consisted in handing tools to Worth, the underground helper, and when a streetcar passed at close intervals, as each one passed, he would shout "hot rail" to Worth as a warning and would press his foot on Worth's back to let him know of the danger above. Joseph Sergi's duty was to take care of the wooden guard rail, painted yellow and black, with a red flag attached, which was placed around the manhole while it was open. When vehicles and streetcars passed by, because the streetcars came so close to the manhole that the guard could not stay in one permanent position, his duty was to move the guard back and forth, if necessary.

While the crew was thus working in this manhole, several east bound cars, traveling on the southernmost rails on Fayette Street, passed the manhole.

The watchman, Sergi, testified that he was standing inside the wooden guard rail with his face toward the

north, ready to grab the guard rail if necessary and move it if he thought it was necessary to avoid an accident. One of the men in his crew had put a chalk mark in the street so when the streetcars went by they knew where to place the guard. At the time of the accident the guard was just a trifle south of the chalk mark, enough room for a streetcar to go by. Before the accident he was watching the manhole guard and one of the green streetcars came by and stopped right at the center of the manhole. The motorman opened the doors to let the passengers off. Sergi threw his foot across the manhole and "hollered to the motorman to pull down a bit" so the passengers would not step into the manhole. This was done and then two or three streetcars came down and passed before the one involved in the accident. He saw the east bound streetcar, involved in this accident, as it approached the manhole, and, although he had an unobstructed view of the streetcar, he saw nothing unusual about it and thought it would clear the guard rail. If he had seen a projection he would have moved the guard rail, but he did not see any projection. He said, after the green car went by, "this streetcar came down and hits the manhole guard of ours." He further said, when asked the following question by the Court, "Tell us what you saw. The streetcar was going east, what happened? A. He hit the manhole guard and part of it went into the hole, knocked George Off over, and I ran over and grabbed hold of it and put it around the manhole to be safe, and George said, 'Get Jim out of the hole,' and we got Jim out of the hole." He testified again that part of the manhole guard went in the hole. When asked what part of the streetcar struck the guard, he answered, "One of the steps in the back of the streetcar," and he thought that those steps were used in case the rope broke on the trolley. These are small steps and fold against the side of the streetcar and he thought about four of these steps were down as the streetcar passed the guard. He did not see the steps down before the accident occurred. He first noticed the steps were down

as the car was going by. The front of the car got by all right. When the car hit the guard it knocked George Off down. He and Off took Worth out of the hole. Worth was unconscious, "blood coming down," and Worth was taken to the hospital in an ambulance. On cross-examination Sergi said that he did not notice anything sticking out of the car until after the streetcar had passed and the accident was over.

George E. Off said that he was standing by the manhole ready to hand Mr. Worth a tool. He testified that the guard rail was south of the north rim of the manhole, over part of the manhole at the time of the accident. Three or four streetcars passed and the green car stopped at the hole. The passengers were prevented from getting off there. The streetcar pulled up further and he crouched down to warn Mr. Worth. "It was more streetcars coming. I told him 'hot rail' and pressed my foot on his back to let him know there was danger up above and the next thing I knew I was lying out in Fayette Street." He said that he thought two or three cars passed while he had his foot on Worth's back. He said he was thrown about fifteen feet. He jumped up and went over to the hole and saw Mr. Worth lying, and crouched over. "I told Mr. Sergi to get him out of there and see what is wrong and I pulled him out of the hole, and found blood all streaming down his face." He was unconscious. Off testified that Worth was in a crouching position with his head below the surface of the street at the time of the accident. After the accident the guard rail was "laying flat."

James F. Smith, the operator of the streetcar involved in the accident, testified that his car was painted yellow. He had had no conductor with him since his car had become "a one-man operator." He started his run that morning from Park Terminal and the terminus was Bedford Square. His schedule prescribed forty-seven minutes to cover that route. The accident took place about two o'clock and it was his third or fourth trip from Park Terminal to Bedford Square that day. On account of

traffic conditions he stopped before he reached Park Avenue. When he stopped, the manhole in question was about twenty-two feet in front of him and he noticed that there was someone working in the manhole. He pulled down to the manhole slowly. He noticed a man's head projected above the surface of the street facing south. He said there was no guard around the manhole but it was near the manhole. There were other men present beside the one in the manhole. He went slowly by the manhole and one of the men working there waved him across. He was going slowly.

The first that he knew of the accident was when he was almost up to Miller Brothers, between Liberty and Hanover Street. An officer, who was on the car, came up and spoke to him and as a result he stopped the car. When he stopped the streetcar he went back to the accident to get what information he could. Before he went back an officer in uniform was present. Smith then said: "I looked at the roof steps before I went back. I found some of the steps down but how many I can't recall. I remember some of them being down." He later admitted that positively the first one from the ground was down. He did not notice any indication that any of the steps that were down had come in contact with anything. He said, before he started from the Park Terminal, he inspected the streetcar to see among other things that the steps were pushed up in proper place and the steps were closed when he left Park Terminal on this particular journey.

The steps are supposed to be folded against the side of the car when it is in motion. These roof steps, according to other testimony, when open extend 3½ inches further outside of the streetcar than when they are closed, and two inches beyond the beading or rain sill, fourteen inches above that step and forty-seven inches above the ground, permanently attached and running along the entire length of the streetcar. The width of the tread of the roof steps is about four inches and the steps are very thin. They were painted yellow, the same

color as the car, and the height of the bottom step when open is from 32½ to 33½ inches above the ground. The second step from the bottom is fifty inches above the ground. This height varies with the unevenness of the ground and with the weight of the passengers in the car and the pressure on the springs of the car. According to Exhibit 8, offered in evidence, the dent on the guard rail is about 31½ inches above the ground. The guard rail is 40¼ inches high. These steps are made of steel and it would be impossible to bend them with a piece of wood.

Smith testified that he had had occasion to use these roof steps at times when the trolley came off the wire and the rope broke. On those occasions he pulls the steps down and goes up on the roof to pull the trolley pole down and fixes the rope, and that is why the steps are there. He said, as far as he could recall, the trolley rope did not break on the trip when the accident happened, and he had no occasion to go up on the roof of the car that particular day. He further testified that on a number of occasions when he reached the end of the run at Bedford Square he had found some of the roof steps down. When asked how they happened to get down, he said that this was due to boys "hooking rides" on the back of the car and they pull the roof steps down so they can be secure in hanging on the cars, and passengers often call his attention to that. He said that there was not anything said to him on this particular run about boys hanging on the roof steps.

He further testified that he had a rear vision mirror to assist him with the door which allows people to alight from the rear of the car. He said that with this rear vision mirror he could not see outside of the streetcar at all and, "if you wish to see whether there was anything on the outside of the streetcar, you would have to bring the car to a stop, open the front door and look back along the side of the car." He testified that he made sure that the front of his car would clear the manhole but that to be sure the entire car would pass the

manhole, he would have had to stop his car; open his front door and look back along the right side of the car. When asked why he did not stop and open the doors and look all the way back to see that he had cleared everything, he answered: "The other car had passed him. I was certain everything was all right. I never gave it a thought that something was going to happen." He said that one of the men in the crew waved him across. On cross-examination he admitted that sometimes in traffic, in passing close to objects, the roof steps when down are liable to cause an accident; that he knew that the steps being down had caused accident in some cases; that in looking through the rear vision mirror he could see if anyone was hanging on the side of these steps but when he was busy all the time on the streetcar, "You don't always think about looking"; that he had told the Company on several occasions that boys had been hanging on the back of the car and leaving the steps down and this was liable to cause accidents and that it seemed to be a condition that was hard to correct; that on the newer type of cars these steps are carried in the car and inserted in sockets when they are to be used. The car involved in the accident was an old two-man car which had been remodeled into a one-man car.

Traffic Officer, Charles W. Bredenburg, stationed at Liberty and Fayette Streets, testified that he was in front of Miller Brothers restaurant relieving a traffic jam. He received information that a streetcar had struck a man. He stopped the streetcar at Hanover Street and told the motorman he had had an accident. He examined the streetcar and found that on the rear there were five steps going up to the roof. All five steps were down. On the bottom step there was no indentation "where it had struck something." He said that these steps were extending out and can be folded up on hinges so that ordinarily when the trolley is running the steps are up, but once in awhile a trolley will come through with the steps down. He said that the guard rail had been split. He did not see the streetcar before the accident.

Officer Wilbert O. Roten, a member of the Baltimore City Police Force, testified that he was on the streetcar involved in the accident. He said the car proceeded across Howard Street and down Fayette Street to Park Avenue. He was not paying much attention to whether the streetcar was stopping in the block. Traffic was heavy for Saturday afternoon and the motorman of the streetcar seemed to be taking his time down Fayette Street. He heard a crash and happened to glance down through the bottom of the glass door on the right hand side of the car at the rear. He saw the yellow and black guard rail go sliding across the street. After he heard the crash and saw the guard rail sliding across the street toward the curb, he started to work his way to the front of the car. The car stopped opposite Miller Brothers. He stated, "I do not know what part of the streetcar struck the guard rail, the rear doors were shut." He did not go back to the scene of the accident. He further said the streetcar was going very slowly as the traffic was heavy.

The foreman, John F. Schmelz, was not at the scene and knows nothing about the accident.

The appellee, James W. Worth, remembers nothing about the accident or the immediate preceding events and is permanently and totally disabled.

Appellant contends in its argument (a) that the case should not have been submitted to the jury because there is no evidence that the roof steps on the right rear of the streetcar were open prior to the happening of the accident. (b) It contends that even if there was evidence legally sufficient to prove that the roof step on the car was open prior to the happening of the accident, and that the guard rail struck it, proof of that fact alone would not be sufficient to take the case to the jury in face of the total lack of evidence that the defendant or its operator knew or by the exercise of ordinary care could have known of the position of the step in time to prevent the accident.

(a) As contended by the appellee, surmise and conjecture are not sufficient basis for belief in reaching justiciable conclusions on facts. *Thompson v. Sun Cab Co.*, 170 Md. 299, 306, 184 A. 576. In this case we have direct evidence that the other street cars had passed the guard in the same location and none of these cars had hit the guard. There is also direct evidence that the front of the car safely passed the guard and Officer Roten testified that he heard a crash and happening to glance down through the bottom of the glass door on the right hand rear side of the car saw the guard go sliding across the street. It is not disputed that the front of the car passed the guard. The motorman testified that the car was the same width all the way through from front to back except sometimes where the car is out of line. As there were no projections from the front of the car, that were not projections from the rear of the car, except the roof steps when open and as it is not contradicted that the lower rear roof step was open immediately after the accident, it is reasonable to infer that the lower roof step when open hit the guard. Although it is true that the split mark on the guard might have been caused by the guard falling on the street, yet the fact that this split mark corresponds closely in distance from the ground with the height of the roof step above the ground, is additional evidence that the roof step hit the guard. Also, according to the evidence of the operator of the streetcar, on previous occasions he had found some of the roof steps down. Officer Bredenburg testified that there was an indentation on the bottom step "where it had struck something" and that the guard rail had been split. He said that all five roof steps were down after the accident.

In addition to these facts the testimony of Sergi, the watchman, although not entirely convincing on the point as to whether he saw the lower step hit the guard rail, was admissible. He said at one point, when questioned by the Court, that the streetcar hit the guard. He stated further in his testimony that one of the steps in the back of the streetcar struck the guard and he thought that

those steps were used in case the rope broke on the trolley. He further said he did not notice the steps down as the car was going by; that the front of the car got by all right, but when the car hit the guard it knocked George Off down. It is true that on cross-examination Sergi testified that he did not notice anything sticking out of the car until after the streetcar had passed and the accident over. In the split second in which this contact occurred between the guard and the streetcar, it is probable that all the details of the accident might not have been minutely observed.

We are of opinion, from the facts as above set forth, that as the front of the car passed the guard; that as the only projection in the rear of the streetcar that was not in the front, were the roof steps when open; that as the officer, Roten, looked out of the rear door of the car and saw the guard rail go sliding across the street after he heard the crash; that as Officer Bredenburg said all five roof steps were down after the accident; that as the split mark on the guard corresponded more or less with the height of the bottom roof step above the ground; together with Sergi's statement that one of the steps in the back of the streetcar struck the guard, all amount to sufficient evidence from which a reasonable mind may infer that the lower roof step hit the guard rail, and these facts go beyond mere surmise or conjecture.

(b) Appellant contends that even if the roof step was open prior to the happening of the accident and the guard rail struck it, proof of the fact alone would not be sufficient to take the case to the jury because there is no evidence that the defendant or its operator knew, or by the exercise of ordinary care could have known of the position of the step in time to prevent the accident. Under the evidence offered, we do not find this contention tenable in view of the testimony of James F. Smith, the operator of the streetcar involved in the accident. He testified that before he left Park Terminal he examined the streetcar to see among other things whether the roof steps were pushed up in proper position. He therefore

knew that at times they were not in this proper position. He testified that on a number of occasions, when he reached the end of his run, he found some of the roof steps down and explained this by the fact that boys pulled the roof steps down and passengers often called his attention to this. He said he had told the Transit Company about this. He further said that as his rear vision mirror did not assist him in seeing outside the streetcar, and in order to see whether these roof steps were open before the accident it would have been necessary for him to bring the car to a stop, open the door and look back alongside of the car, which he did not do. He testified, however, that he made sure that the front of his car would clear the manhole. He attributes his failure to look back to the fact that the other cars had passed, that he was certain everything was all right and never thought that anything was going to happen, and that one of the men in the crew waved him across. He testified that he stopped twenty-two feet before he reached the manhole and noticed that someone was working in the manhole. He pulled down slowly and went slowly by the manhole. He therefore knew that he was in a "tight" place. He knew, according to his own admissions, that the steps came down. He should have known that Sergi in front of the car might not have seen these very small, thin steps protruding three and one-half inches beyond the rear of the car, and therefore should have opened his front door and looked along the side of the car to see whether the steps were down. The fact that he looked at the roof steps before going back to the scene of the accident might be interpreted as evidence that he thought they might be down. This Court is therefore of opinion that the operator, from his previous experiences with these steps, in the exercise of ordinary care in this "tight" place should have known of the position of the steps before proceeding to pass the guard rail in time to prevent the accident, according to the reasoning of an ordinary mind, and that this was a jury question. Appellee admits that appellant would not have been negligent

if the steps were always out or supposed to be always out. There was no reason for Sergi to know that these steps were ever out or to anticipate that they were out on this particular occasion. It appears from the photographs offered in evidence that these steps with a four-inch tread, very thin and of the same color as the car would hardly be visible unless particularly looked for. It is admitted by the appellant that negligence on the part of Sergi could not be imputed to appellee, Worth, a fellow employee and it is unnecessary that we further labor that point.

Appellant relies strongly on the case of *United Railways & Electric Co. v. Fletcher*, 95 Md. 533, 52 A. 608. In that case the plaintiff was laying a water pipe in a trench in a street along the track of defendant's street railway. The trench was about three feet from the nearest track. When the cars passed, plaintiff and other workmen had stood in safety on the strip of ground between the trench and the track. At the time of the accident the workmen were filling up the trench. A car approached and while the plaintiff was standing between the track and the trench he saw the conductor on the footboard, which ran along the side of the summer car. It was a well known fact that the foot board was narrow and that the conductor in order to pass along it in safety, if he had to lean in between the successive seats to collect fares, must in passing by the upright standards of the car give to his body a swaying and swinging motion. The plaintiff testified that just as the conductor got to him he swung himself out and struck the plaintiff. The plaintiff testified that, although he saw the conductor on the foot board of the approaching car, he did not watch it as it was coming up because he was satisfied that he was out of the way. That case was taken from the jury. There are material differences between that case and the case at bar. In that case the plaintiff himself was watching the car and he had reason to believe that the conductor might swing himself out and, although he saw the conductor on the footboard, he did not watch

him as he was coming up. In the instant case the plaintiff was not observing the car and was under no duty to do so. He had no reason to believe that the lower roof step would be down and it is doubtful whether the plaintiff, if he had looked, could have seen the roof step.

Appellant also cites *Taylor v. Western Md. R. Co.*, 157 Md. 630, 147 A. 531. In that case the driver of the automobile, the plaintiff, was held guilty of contributory negligence. That case is not pertinent here.

The appellant also cites *Consolidated Ry. Co. v. State, to Use of O'Dea*, 91 Md. 506, 46 A. 1000, where the accident was caused by a city employee allowing a cable, running over the street car, to slacken. There was no negligence on the part of the railroad company in that case and it is not pertinent here.

It is needless for us to discuss the cases cited on the point that a defendant is not liable where he did not know or by the exercise of ordinary care could have known of the presence of the danger of the roof step being down. *Maryland State Fair, Inc., v. Henderson*, 164 Md. 587, 165 A. 698; *Gargan v. West End Street Railway Co.*, 176 Mass. 106, 57 N. E. 217, 49 *L. R. A.* 421, 79 Am. St. Rep. 298; *Stewart v. Philadelphia Rapid Transit Co.*, 1931, 103 Pa. Super. 366, 157 A. 37; *McCaffrey v. Twenty-Third Street Railroad Co.*, 47 Hun, N. Y., 404. We find that an ordinary mind might conclude that the operator of the streetcar in this case, from previous experience, had reason to believe that the roof step might be down and in the "tight" place in which he was, by the exercise of ordinary care should have determined whether the bottom step was down.

In the case of *Citizens Savings Bank v. Covington*, 174 Md. 633, 199 A. 849, the Savings Bank, under a minor privilege permit from Baltimore City, was given the private right to maintain a coal hole in the sidewalk. On top of this coal hole was a sheet iron door flush with the sidewalk, which could be raised by an iron handle in the shape of an inverted U which was designed so as to fall of its own weight into place. The plaintiff, Georgia

C. Covington, while walking along the sidewalk caught her foot in this handle, the handle not having fallen back in place, and sued for damages. This Court affirmed the lower Court in refusing to take that case from the jury. Appellant distinguishes that case from the one at bar because it claims that notice was not necessary in that case, while notice is necessary here. In the instant case we are of opinion from previous experiences that the roof steps could be pulled down, the appellant had notice that they might be down at the time of the accident. There is no question here that the streetcar company had the right to maintain the roof steps, either open at all times or closed at all times, but where it was the universal practice to keep them closed at all times, if the steps were opened by the mischievous or malicious action of boys riding on the streetcar and this practice was known to the appellant, the negligence was imputed to the appellant. It was said in the case of *Citizens Savings Bank v. Covington, supra,* 174 Md. at pages 637 and 638, 199 A. at page 851: "There is no question here of the right of the defendant to maintain a cellar-door in the sidewalk, but it is a privilege to be enjoyed without danger of injury to pedestrians who are only required to use ordinary care in their use of the street. The owner is not required, in order to impose liability, that he should know of the misplaced handle, used in the raising or lowering of the door. If the device was so constructed or left in such condition that it may be disturbed by the mischievous or malicious, then the negligence is imputable to the owner. *Calder v. Smalley,* 66 Iowa 219, 23 N. W. 638, 55 Am. Rep. 270."

It is true, as said in the case of *E. H. Koester Bakery Co. v. Poller,* 187 Md. 324, 50 A. 2d 234, that mere failure to provide the most modern equipment on a streetcar is not negligence in the absence of any evidence that the equipment was defective or inadequate. However, in the instant case, from the fact that these roof steps were in a position to be pulled down by mischievous persons, and had been so pulled down, and the more modern cars

provide for roof steps which are carried inside the car and put in place by the operator, the motorman was on notice that the roof steps might be down at the time of this accident.

In the case of *Lahey v. Central Park, N. & E. R. R. Co.*, 2 Misc. 537, 22 N. Y. S. 380, cited by the appellee, the plaintiff was a municipal employee engaged with other workmen near a street railroad track in laying pipe in an excavation. A watchman had been employed by the street railway. A section of pipe was temporarily placed near the track and was struck at one end by the step of a passing streetcar traveling six miles an hour and thrown against the plaintiff who was standing with his back to the approaching car between the excavation and the pipe. The Court affirmed a verdict for the plaintiff and in finding evidence of primary negligence and no evidence of contributory negligence, the Court said at page 381 of 22 N. Y. S.: "* * * A street-railroad company has not the exclusive right to the use of its tracks, but simply a paramount right. *Fleckenstein v. [Dry Dock, E. B. & B.] R. Co.*, 105 N. Y. 655, 11 N. E. Rep. 951. The railroad company has the preference. *Warner v. [New York Cent.] Railroad Co.*, 44 N. Y. 465. While a person may not recklessly, carelessly, or willfully obstruct the passage of the cars of a street railroad, he is not bound to keep off the tracks; and if he, fairly, and in a reasonable manner, respecting the paramount right of the railroad company, temporarily obstructs the track, when necessarily engaged in the prosecution of a lawful business, and is, without fault on his part, injured by negligence chargeable to the railroad company, he may maintain an action for his damages. *Fleckenstein v. [Dry Dock, E. B. & B.] Railroad Co., supra.* * * * The evidence, when taken as a whole, indicates very forcibly that it was the duty of defendant's driver to approach and pass this point slowly and cautiously, at a rate of speed which would have enabled him to stop his car *almost instantly* upon discovering danger. See *Schneider v. [Second Ave.] Railroad Co.*, 133 N. Y. 583, 30 N. E.

752; *McGrath v.* [*New York Cent. & H.*] *Railroad Co.*, 63 N. Y. 522; *Kissenger v.* [*New York & H.*] *Railroad Co.*, 56 N. Y. 538; *Ernst v.* [*Hudson River*] *Railroad Co.*, 39 N. Y. 61, 100 Am. Dec. 405." (Italics here.) *Clautice v. Murphy,* 180 Md. 558, 563, 26 A. 2d 406.

In the case of *Potts v. Armour & Co.,* 183 Md. 483, 39 A. 2d 552, the plaintiff was struck by an iron meat hook on the loading platform of defendant's building. This Court said in that case at page 488, of 183 Md. at page 555 of 39 A. 2d, which is applicable here: "We specifically hold that where an injury has been caused by an apparatus in the control of the defendant and of such a character that ordinarily the injury would not have been inflicted if the defendant had exercised reasonable care in its construction, inspection and use, a presumption arises, in the absence of an explanation which the jury accepts, that the injury would not have been inflicted if the defendant had exercised reasonable care. *J. C. Penney Co. v. Evans,* 172 Miss. 900, 160 So. 779; *Wilson v. Colonial Air Transport,* 278 Mass. 420, 180 N. E. 212, 83 A. L. R. 329. If the trial court finds that conflicting inferences may be drawn, choice of inference must be made by the jury. *George Foltis, Inc. v. City of New York,* 287 N. Y. 108, 38 N. E. 2d 455 [153 A. L. R. 1122]."

It is true, as pointed out in the case of *E. H. Koester Bakery Co. v. Poller, supra,* that the street railway company owes its passengers a duty to deliver them to their destination as quickly as possible, consistent with safety. However, it is the duty of the motorman, when operating a street car on the public streets, to keep a lookout, signal the approach when such warning is reasonably necessary, move at a moderate speed and stop when necessity for stopping becomes apparent. *Baltimore Transit Co. v. Alexander,* 172 Md. 454, 462, 192 A. 349; *Washington, B. & A. R. Co. v. Fingles,* 135 Md. 574, 582, 583, 109 A. 431; *United Rys. & Electric Co. of Baltimore v. Mantik,* 127 Md. 197, 200, 201, 96 A. 261.

In *Davidson Bros. Co. v. Des Moines City R. Co.,* 170 Iowa 467, 153 N. W. 79, Ann. Cas. 1917C, 1226, the plain-

tiff's truck was parked on a public street so that a street car rounding a curve could not clear it. The truck was parked to deliver merchandise. The railway company, defendant, charged the plaintiff with contributory negligence in so parking its truck. The operator of the street car testified that he was moving slowly, that he noticed the clearance was close but the front end cleared the truck and he continued his course until the rear steps, which projected beyond the body of the car, struck the truck. The Court there held that the case was properly submitted to the jury and pointed out that it was a fair inference from the statement of the motorman that when he found the front end would clear the truck he forgot for the moment the danger from the projecting steps in the rear, and, if so, his negligence was a question for the jury. Further, that even if he was not forgetful and was in the honest belief or opinion that there was room for him to pass the truck which he could clearly see, it would still be a question of fact and not of law whether he was exercising the reasonable care that his duty required.

In the case of *Luedeke v. New York Central & H. R. R. Co.*, 164 App. Div. 104, 149 N. Y. S. 525, motion for reargument and leave to appeal denied, 165 App. Div. 948, 150 N. Y. S. 1094, several locomotives of the defendant's railway company were left on its regular tracks with the fire banked, steam up, and ready for use. Only the opening of the throttle was required to move them. In some manner, without anyone in charge of it, one of the locomotives was started and ran into another locomotive killing plaintiff's intestate. In the suit against the railroad company it was shown that on previous occasions boys and tramps had actually started these engines. The railroad company denied liability and claimed among other things that the throttle must have been opened by a third person, or maliciously by one of its employees. The Court there held that the failure of the railroad to safeguard against this accident was to be measured by

the same standard whether the engine was started by a trespasser or maliciously by an employee. The Court narrowed the question to whether the defendant should have anticipated and provided against the starting of the locomotive by a trespasser or maliciously by an employee; that common prudence should have suggested the danger of the accident; and unquestionably, therefore, it was a question of fact for the consideration of the jury.

The appellant further contends that the last negligent act and the direct proximate cause of the accident without which it would not have occurred, was the negligence of the watchman, Sergi, stationed at the manhole, who was in charge of the guard rail and who was in the employ of the Consolidated Gas, Electric Light & Power Company of Baltimore City, and that therefore the case should not have been submitted to the jury and the motion *non obstante veredicto* should have been granted. It is, of course, true that the law looks at the proximate and not the remote cause of an injury. *Mayor & City Council of Hagerstown v. Foltz,* 133 Md. 52, 104 A. 267. Nor does negligence constitute a cause of accident unless the negligence charged and the injuries resulting bear the relation of cause and effect. *Anne Arundel County v. Collison,* 122 Md. 91, 95, 89 A. 325.

This Court is of opinion that we should not rule as a matter of law that Sergi was guilty of primary negligence, the only proximate cause of the accident. As above set forth, if any part of the car struck the guard, it must have been the roof step, the front having cleared it. Sergi had no reason to believe that the roof steps which were always kept closed, were open at that time. Furthermore, from the photographs offered, from the thinness and size of the roof step, its position at a very low point on the car, painted the same color as the car, and extending 3½ inches beyond the car at its location and only two inches beyond the beading or rain sill about fourteen inches above that step, it is doubtful whether anyone unless particularly looking for that roof

step would have seen it. There is no evidence in this case that Sergi knew or should have known that this roof step, which at all times is supposed to be closed, was open. This lowered roof step was not a part of the normal and anticipated overhang of the street car. The question of negligence of the employees of The Consolidated Gas, Electric Light & Power Company of Baltimore City, was properly left to the determination of the jury under proper instructions.

As pointed out in appellee's brief, it was said by Judge Mitchell, in the case of *Armiger v. Baltimore Transit Co., supra,* 173 Md. at page 427, 196 A. at page 115:

"As had been intimated, the application of the principle of proximate cause to the facts in a given case is not always without its difficulties. But the general rule is that, where the injury of the plaintiff is the result of concurring causes, the question is one which should be submitted to the jury; unless, however, the evidence discloses a state of facts showing no connection between the injury and the negligence charged, except the bare possibility that the former resulted from the latter, or an uncontroverted state of facts establishing an efficient intervening cause which would preclude the defendant's act from being the proximate cause of injury."

As was said by Judge Markell in the very recent case of *Charlton Bros. Transportation Co., Inc. v. Garrettson,* 188 Md. 85, 51 A. 2d 642, 645, "Furthermore, if the collision happened in a 'split second,' as one witness said, momentary inattention of the motorman might be sufficient to make the difference between striking the trailer near the rear and not striking it at all." And futher in the same case: "The law requires proof of probable, not merely possible, facts, including causal relations. Reasoning *post hoc, propter hoc* is a recognized logical fallacy, a *non sequitur.* But sequence of events, plus proof of *possible* causal relation, may amount to proof of *probable* causal relation, in the absence of evidence of any other equally probable cause. *Baltimore City Pass. Ry. Co. v. Kemp,* 61 Md. 74; *State of Maryland, to Use of Goralski v.*

*General Stevedoring Co.,* D. C., 213 F. 51, 61, 62, affirmed. *Foard [Co. of Baltimore City] v. State,* 4 Cir., 219 F. 827, 830, 832."

The defendant, appellant, asked an instruction that, if the jury find damages for the plaintiff, appellee, such damages should not include any amount or amounts which the equitable plaintiff, Consolidated Gas, Electric Light & Power Company of Baltimore City, has made or is required to make to the plaintiff, appellee, under the Workmen's Compensation Law of Maryland as a result of the accident complained of.

Under the provisions of Article 101, Section 72, Flack's Code, 1943 Supplement (now Section 59), it is provided substantially that where an employee is injured and the injury is one for which Workmen's Compensation is payable and the injury was caused under circumstances creating legal liability in a person other than the employer, the employee may proceed either by law against the third person for damages or against the employer for compensation, or in case of joint tort feasors against both. The employer, if compensation is awarded, may enforce for his benefit the liability of the third person, provided if damages are recovered in excess of compensation awarded and certain expenses, then such excess shall be paid to the injured employee. If the employer shall not within two months from the award by the Commission start proceedings to enforce the liability of the third person, the injured employee may himself enforce such liability with a provision that if damages are recovered, the injured employee may retain the expenses and costs of the action and the employer shall be reimbursed for the compensation awarded and specified expenses. The balance in excess of those items shall enure to the injured employee. Finally, the amount thus received by the injured employee shall be in lieu of any award that might otherwise have been made thereafter in the same case under the provisions of the Workmen's Compensation Act. The Consolidated Gas, Electric Light & Power Company of Baltimore City, not having filed suit under the

provisions of this Act, the plaintiff, appellee, filed a suit, to his own use and to the use of his employer, who had been ordered to pay Workmen's Compensation, against the appellant here.

In the case of *Baltimore Transit Co. v. State, to Use of Schriefer*, 183 Md. 674, 39 A. 2d 858, 156 A. L. R. 460, an employee of the City of Baltimore was killed while driving a truck in collision with a street car. An award had been made to the dependents of the deceased by the State Industrial Accident Commission against the City. The dependents of the employee sued the Transit Company, the owner of the truck on which the deceased was riding, and the driver of the truck. The Transit Company sought to implead the City under the joint tort feasors act. Judge Henderson, speaking for this Court, said at pages 681 and 682 of 183 Md., at pages 861 of 39 A. 2d: "The appellant contends, however, that if it is not permitted to implead the employer, the employer may not only escape liability in tort, but escape liability under the Compensation Act. If a judgment is rendered against the appellant in the case at bar, in an amount equal to or in excess of the amount of the award, the employer would be entitled under the provisions of Section 72 (now 59) of Article 101 to repayment of the award. It is said that such a result violates the principle that no one should profit by his own wrong, and allows the negligent employer to shift the burden assumed under the Compensation Act upon a joint participant in the tort. It is true that the policy of limiting an employer's liability does not necessarily require that he be relieved of all liability, where he is a participant in the tort. But the short answer to this contention is that there is no provision in the Compensation Act forbidding reimbursement in those cases, where the employer is a participant." See also *Caulfield v. Elmhurst Contracting Co.*, 268 App. Div. 661, 53 N. Y. S. 2d 25.

An actuary in the employ of the Sun Life Insurance Company of America, produced as a witness by the appellant, was asked the following question:

"Now, Mr. Kenigson, what according to those tables, is the value of a life annuity on April 1st, 1944, of a man in good health, born April 18th, 1896, which will provide an income of $39.15 per week? A. The cost of such annuity with my company would have been $43,826.19." This question was objected to and before the answer was given by the witness, the appellant states that the Court remarked in the hearing of the jury:

" (The Court) I knew it was coming so I dug it out. I think the Court of Appeals has gone about along the lines that Mr. Berman is following up." The Court then asked:

"Just what do you mean by the tables that you use? A. Practically all of the companies base their annuity rates on what is known as the 1937 standard annuity tables.

"Q. What is that? A. It is an annuity table—a mortality table which is constructed on the basis of actual annuity experience for life insurance."

The appellant objects to this testimony because the name of James W. Worth was not mentioned and because the jury was never enlightened as to what actuary tables are. We do not see how the jury could have possibly failed to understand that the reference was to the plaintiff, appellee. Appellant admits that on the previous day the plaintiff, appellee, himself had testified to his date of birth. Due to the prevalence of life insurance and annuities today, the average man usually knows what is meant by "actuary tables." The jury should, of course, have known what this testimony meant. *Sherley v. Sherley,* 118 Md. 1, 84 A. 160; *Baltimore & Ohio Railroad Co. v. Whitacre,* 124 Md. 411, 92 A. 1060; *State, for Use of Mitchell v. Jones,* 186 Md. 270, 46 A. 2d 623, 626. The plaintiff, appellee, when asked what was the condition of his health before the accident, testified that: "The only thing I would get colds in the head, something like that. * * * Well, I had been a little hard of hearing but I didn't have to worry about it. I could do my work without any trouble. * * * I worked always,

regularly." The jury, or course, heard testimony as to his condition after the accident. The trial judge instructed the jury that in calculating damages they were to consider the plaintiff's condition and health before the injuries complained of. If there was error in not explaining more fully to the jury what "actuary tables" were, the error apparently had not prejudiced the appellant because the jury seemingly paid little attention to this evidence, as the amount of the verdict was less than half the amount of the cost of the annuity.

Appellant specially excepts to the failure of the Court to grant its ninth prayer. This was an instruction that even if the jury "find from the evidence that the accident described in the testimony was caused by the projection of the roof step, by reason of its displacement out of its closed position and beyond the body of the street car, as claimed by the Plaintiff, the Jury are instructed that their verdict must nevertheless be for the Defendant unless they further find that the Defendant or its employees knew or by the exercise of ordinary care should have known of the displacement of such roof step out of its closed position prior to the happening of the accident described in the testimony." This prayer ignores the evidence that the operator of this car knew that these steps were frequently displaced and that he had so previously told the company. In view of this evidence the prayer is too narrow in its application to this case. As we find no error the judgment will be affirmed.

*Judgment affirmed, with costs.*