## Hamley, Appellant, v. Pittsburgh Railways Company.

Argued September 30, 1942. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Ella Graubart,* with her *Patterson, Crawford, Arensberg & Dunn,* for appellant.

*E. W. Langfitt,* with him *J. R. McNary,* for appellee.

OPINION BY MR. CHIEF JUSTICE SCHAFFER, November 23, 1942:

This action was brought by plaintiff to recover damages for serious injuries sustained by her on August 1, 1938, when the automobile she was driving, while skidding, collided with a street car of defendant, on the Pittsburgh Sixteenth Street bridge. The case was sent to the jury by the trial judge, who, after it disagreed, entered judgment for defendant, from which action plaintiff appeals.

Upon the bridge there are two street railway tracks, one on which cars operate from the city, the other upon which they run to it. The street car which figured in the collision was outbound, plaintiff was inbound. The automobile started to cross on its right side and began to skid. The time was about 8.30 in the morning. Rain was falling. Plaintiff, because of her injuries, has no recollection of anything which happened after she entered upon the bridge, except that she was then traveling at 25 or 30 miles an hour. The automobile was a Ford coupé with a single seat. Two persons, a young man and a young woman, in addition to plaintiff, occupied it. She was driving. The woman passenger did not appear at the trial. The reason for her absence was residence in another State. The only witness who testified in plaintiff's behalf, as to what took place, was the man passen-

ger, Madducks, and for the defendant, as to the circumstances, the motorman, Woods.

The legal inquiry is: Did he, the motorman, have sufficient notice of the out-of-the ordinary approach of the skidding automobile and opportunity, after realizing the danger, to stop his car and avoid the collision, if stopping would have prevented the impact, because all that he could have done was stop. He was tied to the rails.

Madducks testified that almost immediately after the automobile came upon the asphalt roadway of the bridge, straddling the inbound track, and travelling at 25 or 30 miles an hour, it began to skid. Presumptively this was due to the rain. No other reason is assigned for plaintiff's loss of control. The roadway was 37 feet 9½ inches wide and there was a space 11 feet 6 inches wide on each side of the car tracks between them and the curb which separated the roadway and footway. The witness thus described what happened: "When we got up on to the bridge along about the second pole, we skidded and went over toward the right side of the bridge and hit the right side and then skidded over to the left and hit the left side of the bridge and as we were coming back toward the right side again, we were hit by a car owned by the Pittsburgh Railways." In answer to the question where he first saw the street car, he said: "The first part of our skid was to the right and we hit the rail of the bridge and the first time I recall seeing the street car was after we turned to the left to go over to the left side. Just as soon as we turned over is my first recollection of the car. . . . It was right after we made the turn, from hitting the right side of the bridge, that I noticed the street car coming from the other side." He fixed the street car as then being approximately 340 feet away, measuring it by the poles on the bridge which were 20 feet apart. Further describing what occurred, he said, after skidding to the right they skidded clear across the roadway to the left side and were coming

back to the right when the collision took place. He said from the point where they started to skid, until they collided with the car was about 120 feet. There were no other vehicles between them and the street car. He did not know whether it was moving or had stopped when they came together. He estimated that between the time he first saw the street car and the collision, the street car had moved about 100 feet in their direction.

A motorman, who had been employed by defendant about five years before the accident, gave it as his opinion that the street car, going at the rate of 25 miles an hour (which was the speed assigned to it by testimony), could have been stopped in a distance of 60 feet.

Woods, the motorman of the car, called by defendant, testified that when he first saw plaintiff's automobile it was on the inbound tracks, skidding toward the right, his car being on the outbound, suddenly it turned left when it was between 75 and 100 feet from him. He was then running about 20 or 25 miles an hour. When it was about 50 feet from him, it "veered over" toward him, taking a left course and then a right one. He endeavored to stop his car by sanding the track and applying the airbrake. He was not able to completely stop, but "it was very, very close" to stopping. When he saw there was going to be a collision, he turned his face away to avoid being struck by broken glass. He stated, on cross-examination, that he did not put his brakes on as soon as he saw the automobile start to skid, but that he did, "When I first seen them coming over to my side." He did not put on the brakes immediately, because he "thought they would swing over." He said the automobile ran into his car.

Owing to the lapse of time between the date of the accident and the trial, about three years and a half, the recollection of witnesses as to time, distances, etc., was not too certain.

The case is a very close one, but we have concluded that it is for the jury under adequate and careful in-

structions. It is obvious that all the happenings were in a very short space of time, within a few seconds. We think it could not be said to be negligent conduct on the part of the motorman not to act by putting on his brakes, when the automobile 340 feet away, started to skid across the highway. He would not have known then that it was going to dash across the 37 feet of driveway, again turn to the right and strike his car. Whether, when it started in his direction, he should have more speedily put on the brakes is the critical question. Even if he had stopped sooner than he did, the collision might have taken place. There is no evidence of inattention on his part. It could not be said that turning his head to avoid injury to his eyes and face from glass which might be broken was such.

When the case comes again to be tried, principles which should control it are those stated in *Cox v. Wilkes-Barre Ry. Corp.*, 340 Pa. 554, 17 A.2d 367, (p. 559): " 'It is not the duty of a street railway company to anticipate and provide against every exigency or possible contingency that may suddenly arise in the operation of its lines, . . . it performs its whole duty by the exercise of care according to the circumstances. . . . It is the duty of a motorman to keep a constant lookout ahead, and to have such control of his car as to avoid dangers ordinarily incident to its operation, and also to avoid such unusual and unexpected dangers as he saw in time to avoid' . . . Nor is the motorman bound to so control his car as to avoid injury to a vehicle that might suddenly skid into his path. . . . 'Where danger appears in the way, it must be a sufficient distance from the car, and give time enough to enable the operator to stop or slow down to avoid an accident. He must have the opportunity to act.' "

The judgment is reversed, so that a new trial may be had.