# JENS C. PETERSON v.
# MINNEAPOLIS STREET RAILWAY COMPANY.[1]

May 16, 1952.

No. 35,366.

*Donald O. Wright,* for appellant.
*Freeman, King, Larson & Peterson,* for respondent.

MAGNEY, JUSTICE.

This is an appeal from an order denying plaintiff's motion for a new trial after verdict for defendant in an action to recover damages for personal injuries.

---

[1]Reported in 53 N. W. (2d) 817.

Plaintiff, Jens C. Peterson, suffered serious injury in a collision with one of defendant's streetcars about 10:30 p. m., February 12, 1948, at the west end of a viaduct which carries Glenwood avenue over the tracks of the Great Northern Railway Company and the Minneapolis & St. Louis Railroad Company in the city of Minneapolis. Plaintiff was an employe of the M. & St. L. and, at the time of the injury, was engaged in replacing the bulb in a red warning-light fixture at the west end of a girder which extends through the middle of the viaduct, dividing the eastbound and westbound lanes of motor and streetcar traffic over the viaduct. Plaintiff struck the left side of an eastbound streetcar as it passed close to the south side of the girder. Marks on the streetcar indicate that the point of contact was about 12 feet from the front of the car.

The viaduct is 205 feet long. The girder, which is 53 inches high, runs the entire length of the viaduct and rests upon a concrete base about 5 inches above the street level. The girder is 12½ inches wide at the top and, including the concrete base, 23½ inches wide at the bottom. At the west end of the girder there is a vertical board painted with black-and-white stripes. The fixture for the red warning light is above this board. The center of the lamp is 9½ inches above the girder, 63 inches from the pavement.

The near rail of the eastbound streetcar track is 35 inches from the girder. The side of the streetcar projected 24 inches beyond the rail toward the girder. Thus, there was a clearance of 11 inches between the girder and the passing streetcar.

A pendant arc light hangs 39 feet 6 inches west of the west end of the viaduct above the trolley wires, a little nearer the eastbound trolley rail than the westbound one. The motorman of defendant's streetcar testified that as he approached the arc light from the west, up a slight incline to the viaduct, at 10 to 15 miles per hour, he could not see beyond the light, though he was looking ahead. He continued to look ahead after he passed the light, but did not see plaintiff until he was six feet from him. He was startled when he saw plaintiff and applied the emergency brakes. When he saw that

plaintiff was clearing the front of the car by several inches, he released the brakes and coasted. He was unaware of the collision until he was informed by a passenger that plaintiff was lying on the tracks behind the car.

Plaintiff testified that he arrived at the viaduct five or ten minutes before the accident. He had removed a red-globed kerosene lamp which had been wired in front of the regular light and had placed it on the girder behind the light fixture slightly to the right. He was standing with his right side against the girder, facing north, moving a flashlight back and forth in his left hand, while with his right hand he was unbolting the hinged lens of the light fixture. He was wearing a gray cap and gray knee-length coat. He was not moving around. The motorman did not see the flashlight, nor did any of his passengers. The motorman testified that when he first saw plaintiff the latter was facing the girder, with his back toward approaching eastbound traffic.

■ Plaintiff assigns as error the refusal of the trial court to instruct the jury upon the issue of defendant's wilful and wanton negligence. The contention is not supported by the evidence. If defendant's motorman did not operate the streetcar with ordinary care after discovery of plaintiff's position of peril, the motorman was guilty of wilful and wanton negligence, and plaintiff's contributory negligence, if any, would not bar his recovery. Alger, Smith & Co. v. Duluth-Superior Traction Co. 93 Minn. 314, 101 N. W. 298. The evidence in the case at bar would not support a jury finding that the motorman discovered plaintiff's perilous position in time to stop the car or give an effective warning of the approach of the car. The only evidence upon the subject is the testimony of the motorman that he did not see plaintiff until he was 6 feet from plaintiff. No inference that the car could have been stopped or an effective warning given can be indulged. No issue of wilful and wanton negligence is presented by the evidence.

■ Plaintiff requested an instruction that the defendant was negligent as a matter of law, and refusal to give the instruction is assigned as error.

The duty of the operator of a streetcar has been stated in Wright v. Minneapolis St. Ry. Co. 222 Minn. 105, 112, 23 N. W. (2d) 347, 353:

"The duty of a motorman in operating and managing a streetcar is to exercise ordinary or reasonable care to avoid harm to others. Ordinary or reasonable care is care commensurate with the circumstances. A motorman must keep a reasonable lookout ahead so as to be able to take proper precautions to avoid accidents."

And, as stated at 222 Minn. 113, 23 N. W. (2d) 354:

"* * * A motorman is bound to maintain a lookout for people *where he ought to know they are likely to be.*" (Italics supplied.)

The care and prudence employed must be reasonable in the circumstances, but the operator of the streetcar may assume that workmen on the streets will not increase danger by failure to exercise ordinary care in lookout for streetcars, or by failure to get out of the way in time to avoid danger. 2 Nellis, Street Railways (2 ed.) § 407.

Plaintiff contends that reasonable men could not find that the motorman was exercising ordinary care in maintaining a lookout in front of the streetcar; that the only possible inference is that the motorman was not maintaining a lookout or plaintiff would have been discovered; but that, even if the testimony of the motorman that he was looking is given credence, he must have been negligent in proceeding blindly into an area where he could not see plaintiff in time to stop or in time to warn him of the streetcar's approach. In other words, it is argued that the motorman, in the exercise of ordinary care in the circumstances, would have seen plaintiff standing near the tracks, 40 feet from an arc light of unknown illuminating power, without warning lights visible to approaching traffic, in gray clothing, at a point which is not a crosswalk, and where the evidence does not disclose that pedestrians or workmen usually stand or work.

The weakness of this contention is that it would set a standard of reasonableness of lookout without regard to the circumstances

disclosed by the evidence. The law does not require the motorman to see all or to take every possible precaution in lookout; his precaution is to be measured by that which appears likely in the usual course. Schmidt v. Steinway & H. P. Ry. Co. 132 N. Y. 566, 30 N. E. 389. "The risk reasonably to be perceived defines the duty to be obeyed." Nees v. Minneapolis St. Ry. Co. 218 Minn. 532, 538, 16 N. W. (2d) 758, 762. Where the pedestrian public makes but a limited use of the street, the public interest is subordinated to the necessities of street railway operation to some extent, and the street railway may properly operate its cars at greater speed and with a lesser degree of care. Wosika v. St. Paul City Ry. Co. 80 Minn. 364, 83 N. W. 386; see, Strutzel v. St. Paul City Ry. Co. 47 Minn. 543, 545, 50 N. W. 690, 691.

In Wright v. Minneapolis St. Ry. Co. 222 Minn. 105, 23 N. W. (2d) 347, cited by plaintiff, the motorman stopped his car so the front projected into a crosswalk. If the motorman had stopped before the crosswalk, he could have seen the crosswalk and could have seen plaintiff from the usual driving position. The streetcar was started without warning and struck a small boy immediately in front of the car and beyond the motorman's vision. This court recognized that the circumstances of the case defined the duty of lookout imposed on the motorman, and said (222 Minn. 118, 23 N. W. [2d] 356):

"* * * Because the motorman knew that he was blocking the crosswalk, he should have anticipated that pedestrians crossing the street might pass along the side of the streetcar and in front of it to get across. Under those circumstances, he should have made such observation as was necessary to ascertain whether any pedestrians were passing or were about to pass in front of the streetcar and taken such precautions as were necessary to avoid injuring them. * * * If he had stopped where he should have, he could have made such an observation. Because stopping where he had no right to do so disabled the motorman under the circumstances from making a proper observation to his left while operating the car in a sitting position, it became incumbent on him to take such

measures as would enable him to observe that it was safe to start before proceeding forward with the streetcar, or to give a timely and adequate warning that he intended to do so."

Thus, it appears that the Wright case does not hold the motorman to a duty to see all, but to see what in the circumstances ordinary care requires him to see.

It is true that failure to see a pedestrian upon the street is usually evidence of negligence, requiring the issue to be submitted to the jury. Thus, in Anderson v. Minneapolis St. Ry. Co. 42 Minn. 490, 44 N. W. 518, 18 A. S. R. 525, it was held error to direct a verdict for defendant where a child ran into the street while the operator of the streetcar had his head turned to make change for a passenger and a collision followed. This court held that it was for the jury to say whether the driver would have seen the child in time to stop the car if he had been exercising due care and caution. Cf. Weissner v. St. Paul City Ry. Co. 47 Minn. 468, 50 N. W. 606; McCabe v. Duluth St. Ry. Co. 175 Minn. 22, 220 N. W. 162; Rogers v. Minneapolis St. Ry. Co. 218 Minn. 454, 16 N. W. (2d) 516; Warren v. Mendenhall, 77 Minn. 145, 79 N. W. 661; Schuman v. Minneapolis St. Ry. Co. 209 Minn. 334, 296 N. W. 174. The duty of lookout of a streetcar motorman should not be greater than that of the operator of an automobile under circumstances where we have held that the operator is not negligent as a matter of law in not seeing a pedestrian dressed in dark clothes, on a dark night, though in the city, and near a street light. Becklund v. Daniels, 230 Minn. 442, 42 N. W. (2d) 8.

Heiden v. Minneapolis St. Ry. Co. 154 Minn. 102, 191 N. W. 254, held that a motorman must operate his car at a speed and with such lookout that when vehicles on the track ahead can be discerned he can stop in time to avoid collision. In that case, a streetcar collided with a wagon ahead of it on the street. Such a vehicle, under the circumstances, was certainly reasonably to be anticipated upon the highway, and ordinary care required that the speed of the streetcar be limited and a lookout maintained, which would have disclosed the presence of the wagon.

In the case at bar, it cannot be said that the operator of the streetcar was negligent as a matter of law in failing to see plaintiff in time to stop or warn him. The arc light over the street prevented vision until the streetcar passed it, 40 feet from plaintiff. But there was still time to stop or warn, and any negligence in the approach to that point would not be a proximate cause of plaintiff's injury. After the car passed under the light, the motorman, though he was looking, did not see plaintiff standing in front of the girder. There were no visible warning lights at the end of the girder. The jury could find that plaintiff's flashlight, if used, was inadequate or improperly used, and that the operator of the streetcar could not see its beams. Plaintiff was not standing on the track, but to the side of the track, up against the girder. He was not moving about. His clothes were dark. Though the motorman had passed over the bridge before, there is nothing to indicate that he was aware or should have been aware that persons were likely to work on the bridge at night, or that the bridge was used as a pedestrian crossing, although, of course, pedestrians had a right to cross, and plaintiff properly and lawfully could work there at night. The motorman might properly assume that if a workman was present he would at least have a light which could be seen and which would warn him of the workman's presence. A lesser lookout than that required to see plaintiff would have disclosed a *moving* pedestrian, since plaintiff was *standing* against the girder and not moving about. It may be conceded that plaintiff would have been visible if particular care had been used in attempting to see him. But it must be remembered that the expert who testified that a person standing in front of the girder could be seen was looking specifically at that point, for a particular reason. He did not have a duty also to look ahead of the car for other vehicles and pedestrians, to the side for passing vehicles, and to some extent at the passengers in the car.

The fact that there was little clearance between the streetcar and the girder and that the warning light was not burning did not call for special care by the motorman. A motorman may be called

upon to exercise closer lookout in tight places where he is unfamiliar with the tight place. In this case he had passed the point frequently. There was ample clearance for his car. The tight place was not dangerous in the ordinary course of events. Unless he was bound to anticipate that the lack of clearance was dangerous in this case because of plaintiff's presence, there was no occasion for a greater amount of care as to lookout. The fact that the warning light on the girder was not burning was not necessarily the occasion for anticipating that plaintiff would be present. The red light was a warning to motor vehicles which might not see the girder. It was not a warning to streetcars, which run on fixed tracks and would in no event strike the girder unless derailed. There was no reason for the operator to pay special attention to the red light, or be concerned if it was not burning, or to anticipate that there would be danger because it was out. Cf. Kilgallen v. Philadelphia Rapid Transit Co. 300 Pa. 451, 150 A. 746.

It was a question for the jury whether the motorman, unaware of the necessity for a special lookout at this point, necessarily engaged also in watching other points for other hazards, should have seen plaintiff standing motionless and without warning lights alongside the track. It was no error to submit the issue to the jury.

■ It was likewise for the jury to decide whether the conduct of plaintiff was negligent, and, if so, whether his negligence was a proximate cause of his injury. Plaintiff testified that as he worked upon the light he used his right hand to operate the wrench with which he was unscrewing the nut and extended his left arm with the flashlight in the direction of approaching traffic. The motorman testified that he did not see the light. The jury could find that plaintiff, with his attention directed predominantly to his work and not to the flashlight, did not give an adequate warning. Moreover, as he worked, he stood perilously close to the streetcar tracks, yet did not see the streetcar approach. The jury could find that he was negligent as to lookout. The jury could find that he moved into the side of the streetcar beyond the point where the streetcar begins to narrow toward the front, and that this movement

was careless. The evidence would support a finding that he was negligent.

■ Refusal to instruct the jury that "A motorman is guilty of negligence if he proceeds blindly," was not error. The duty of the motorman to maintain a lookout was adequately covered in the instructions given, and refusal to give a particularized instruction is not error. 6 Dunnell, Dig. & Supp. §§ 9777, 9778. Similarly, the requested instruction that the motorman was under a duty to keep the car under control so that he could stop in time to avoid a collision, insofar as it was applicable to the facts in evidence, was sufficiently covered in the general instruction given to the jury.

M. S. A. 169.14, subds. 1 and 3, deal with the requirement of reduced speed to avoid collision. It does not appear that the speed of the car was excessive; in any event, excessive speed could not have been a proximate cause of plaintiff's injuries. Since speed was not an issue in the case, it was not error to refuse to instruct the jury as requested. Heiden v. Minneapolis St. Ry. Co. 154 Minn. 102, 191 N. W. 254.

The trial court refused to instruct that "An act done in normal response to the stimulus of the situation created by the actor's negligence is a substantial factor in bringing about the injury and not an independent intervening cause." This language, taken from Smith v. Carlson, 209 Minn. 268, 272, 296 N. W. 132, 134, merely states that an act done in an emergency, created by another, is a cause, whether the act is negligent or not. It does not state the so-called emergency rule, as plaintiff apparently intended. The requested instruction is not applicable to, nor would it clarify, any issue in this case, and was properly refused.

The record discloses no reversible error. The order of the trial court must therefore be affirmed.

Order affirmed.

Matson, Justice (concurring).

I concur in the opinion of Mr. Justice Magney. The evidence, when taken in the light most favorable to the verdict, as is required upon appeal, precludes any determination of negligence as

a matter of law and presents clearly a jury question. Plaintiff was standing directly in front of the west end of the girder which divides the two opposing streams of traffic on the viaduct. He stood either with his right side against the girder and with his left side toward the oncoming streetcar, or else, as the motorman testified, with his face toward the girder and with his back toward the oncoming streetcar. He was dressed in a medium gray, knee-length, tweed overcoat with a light gray collar, a gray cap, and blue trousers. It appeared to the motorman, however, that plaintiff's clothing was dark.

Except for the black-and-white striped board at the end of the girder, which faced oncoming motorists, the girder was of a dark color, with no visible warning lights on it. It is significant that no matter which way plaintiff was facing, his body must have covered practically the entire black-and-white striped board, so that only a very small part thereof, if any, could have been visible. The jury could reasonably find that plaintiff's clothing, whether described as gray or as blue and gray, would naturally have blended with the rest of the girder, so as to make it extremely difficult for the motorman to see plaintiff. Furthermore, plaintiff was standing *motionless* in a place where pedestrians or workmen would not reasonably be expected to be found. No warning lights were placed back of plaintiff or alongside the tracks. Even though plaintiff may have been holding a flashlight, the jury might well have found that under the circumstances it was not sufficiently bright or held in the proper position to give adequate warning to the motorman of plaintiff's presence. In my opinion, it was clearly a question for the jury whether the motorman ought to have seen plaintiff.

LORING, CHIEF JUSTICE (dissenting).

Since I do not regard as adequate the facts stated in the majority opinion, I restate them. The viaduct on which plaintiff was injured was 205 feet long and carried vehicular and pedestrian traffic, as well as streetcars, in both directions. Plaintiff was hurt at the west end of a steel girder 53 inches high, which runs along the middle of the bridge for the entire length of that structure and serves to di-

538

vide the eastbound traffic from the westbound. The girder is 12½ inches wide at the top and, including its concrete base, 23½ inches wide at the bottom. The bottom of the girder, where it rests on the concrete, is about 8 inches above the floor level of the bridge. The concrete base extends approximately 6 inches toward the car tracks from each side of the girder and slopes down 3 inches from the girder to its outside edge, which forms a drop of 5 inches to the floor of the bridge. The distance from the outer edge of the concrete base to the streetcar rail was 2 feet 3½ inches. It was 35 inches from the girder to the nearest eastbound rail. The side of the streetcar projected 24 inches outside the rail toward the girder, so that the clearance between the streetcar and the girder proper was not more than 11 inches, part of which was the 6 inches of sloping concrete base. At the west end of the girder, there was a vertical board painted with black-and-white stripes, above which was an installation on the top of the girder for a red electric light. The fixture containing the electric light extended approximately 4 inches above the girder. There was a pendant arc light over the middle of the street 39 feet 6 inches to the west of the west end of the bridge. This light was hung at least 6 feet higher than the trolley wires and a little nearer to the eastbound rail than to the westbound one.

Plaintiff was employed by the Minneapolis & St. Louis Railroad Company and, at the time he was injured, was engaged in replacing the electric light bulb in the red warning light fixture at the west end of the girder, a service he had performed upon occasion for many years. He was dressed in gray and blue clothes, with an overcoat having a light gray collar. He was struck by the side of a streetcar which approached the bridge from the west on Glenwood avenue. Dust brushed from the car indicated that plaintiff's point of contact with the car was on its left side, about 12 feet back from the front end. From a photograph introduced by defendant, it is apparent that the front end of the car is slightly narrower than the main body of the car; that is, the car widens toward the

back of the cab to a point on the side of the car just back of the front seat for passengers.

The motorman testified that *as he approached* the arc light,[2] 39½ feet west of the viaduct, he could not see beyond it; that he could not see plaintiff and did not see him until the car was within 6 feet of him; that he was so startled by the position in which he saw plaintiff that he instantly put on his emergency brakes; that he then saw plaintiff as the front end of the car passed him; and that he released his brakes and *proceeded* until a passenger told him that plaintiff had been struck. Upon inquiry by defendant's counsel, the motorman stated that the clearance between plaintiff's body and the streetcar, as the cab of the car passed him, was 3 to 5 inches.

In my opinion, the evidence compels the conclusion that, in the exercise of ordinary care, the motorman should have discovered plaintiff's peril and given a warning, stopped, or slowed down to permit plaintiff to step away from the approaching streetcar.

The duty of a motorman to keep a lookout has been well defined not only in Minnesota but in other states. In Anderson v. Minneapolis St. Ry. Co. 42 Minn. 490, 492, 44 N. W. 518, 519, 18 A. S. R. 525, this court, in commenting upon the duties of the driver of a streetcar, used the following language:

"* * * Unquestionably, so far as the public were concerned, it was the duty of the driver to sit or stand where he could have such control of his team and car as was practicable. He should have been in a place and in a condition to exercise a reasonable degree of care and vigilance in watching and observing the street ahead of him, so as to prevent collisions and avoid injury to persons travelling thereon. The right of defendant to run its cars must be exercised with due regard for the rights of others, and with an appreciation of the knowledge that pedestrians, children as well as adults, may be lawfully upon our public ways."

---

[2] This is the light which the majority refer to as "of unknown illuminating power," but which the motorman asserts was so strong that it blinded him, so that he could not see beyond it.

In Wright v. Minneapolis St. Ry. Co. 222 Minn. 105, 112, 23 N. W. (2d) 347, 353, we said:

"The duty of a motorman in operating and managing a streetcar is to exercise ordinary or reasonable care to avoid harm to others. Ordinary or reasonable care is care commensurate with the circumstances. *A motorman must keep a reasonable lookout ahead so as to be able to take proper precautions to avoid accidents.*" (Italics supplied.)

As to other jurisdictions, in Wilkerson v. Philadelphia Transp. Co. 167 Pa. Super. 616, 620, 76 A. (2d) 430, 432, the court said:

"* * * In addition to his duty of having such control of his trolley car as to enable him to avoid dangers ordinarily incident to its operation and also to avoid such unusual and unexpected dangers as he saw or should have seen in time to avoid, *it was the motorman's duty to keep a constant lookout ahead.* Hamley v. Pgh. Rys. Co., 345 Pa. 380, 28 A. 2d 911; Tatarewicz v. United Traction Co., 220 Pa. 560, 69 A. 995; Scholl v. Phila. Sub. Transp. Co., 356 Pa. 217, 51 A. 2d 732. He was required to 'ever be on the alert' and as stated by Mr. Justice Walling in Beaumont v. Beaver Valley Traction Co., 298 Pa. 223, 148 A. 87, at page 230: ' . . . must hold strictly to his work and not for a moment turn away his eyes or his thoughts from his duties.' " (Italics supplied.)

In Lanio v. Kansas City Public Service Co. (Mo.) 162 S. W. (2d) 862, 866, the court said that—

"failure to keep a lookout, * * * in and of itself is a negligent act, the failure to observe which is a breach of duty and if the cause of the injury complained of liability follows as a consequence."

Baltimore Transit Co. v. Worth, 188 Md. 119, 137, 52 A. (2d) 249, 258, 5 A. L. R. (2d) 740, involved injuries to a workman when a projection from a streetcar hit a guardrail. The court said that extra precaution should be taken by the motorman when passing a tight place, and that—

"it is the duty of the motorman, when operating a streetcar on the public streets, to keep a lookout, signal the approach when such warning is reasonably necessary, move at a moderate speed and stop when necessity for stopping becomes apparent."

Defendant sought to leave the impression that the motorman, as he approached plaintiff, was so blinded by the arc light, which was approximately 40 feet to the west of the west end of the girder where plaintiff was working, that he could not see along the track ahead of the car; consequently, that he could not and did not see either plaintiff or the girder until he was within 6 feet of them. Counsel asked the motorman:

"Q. And as you approached that arc light on this particular evening, could you see beyond the arc light?

"A. No, I couldn't."

It is a matter of common knowledge that a light in the position in which the arc light was hanging would not blind the motorman while he was immediately beneath it or after he had passed it; but from that time on it would be a help rather than a hindrance in revealing the part of the street ahead of the car and between the car and the girder, where plaintiff was standing. In addition to the light from the arc light, the streetcar was equipped with a headlight which cast illumination at least 25 feet ahead of the car. The majority opinion ignores the presence of this headlight and what it must have revealed if the motorman had been looking. In my opinion, the motorman's testimony that he could not see plaintiff until he got within 6 feet of him is not entitled to credence.

Then, too, some significance must be given to the absence of the red light from the west end of the girder. This would have warned a reasonably prudent motorman that there was something abnormal about the situation at the west end of the girder and should have put him on the alert to discern what the abnormality was. This motorman was familiar with the route, having operated on this run generally during the previous 2½ years in a new type streetcar, such as that involved here. Had he been looking, he must have

noticed the absence of the red light, which he admits he did not see. I cannot agree with the majority opinion that the absence of the red light was of no concern to the motorman. Nor do I agree that Kilgallen v. Philadelphia Rapid Transit Co. 300 Pa. 451, 150 A. 746 (cited by the majority), is any authority in this respect. That case deals almost entirely with the question of contributory negligence. The motorman in the instant case, from long service on this route, must have known that normally the light was maintained and that when it failed to function someone had to fix it. The absence of the red light should have aroused him to be on the alert for the presence of someone who might be fixing it.

The absence of the red light, plus the fact that he had been blinded by the arc light during his approach thereto, would have required a motorman of ordinary prudence to be alert and to maintain a vigilant lookout immediately upon passing under the light. The majority opinion concedes "that plaintiff would have been visible if particular care had been used in attempting to see him." The majority opinion states that, under the circumstances, a lesser degree of care was required. The opinion cites Schmidt v. Steinway & H. P. Ry. Co. 132 N. Y. 566, 30 N. E. 389, and Nees v. Minneapolis St. Ry. Co. 218 Minn. 532, 538, 16 N. W. (2d) 758, 762. It seems to me that the Nees case has little to do with the duty of maintaining a lookout (and see quotation *infra*). The Schmidt case is to be distinguished, since in that case the worker's foreman signaled the motorman to proceed. The only possible inference to be drawn from the motorman's testimony is that he did not see plaintiff or the girder or attribute any significance to the absence of the red light because he was not maintaining a reasonably prudent lookout ahead of the car, but was operating it as if there were no necessity on his part to keep such a lookout. He was then going 10 or 15 miles an hour up the 6½-percent grade to the west end of the viaduct, although he had been going faster farther west. It is obvious from the motorman's testimony that as the car approached the viaduct plaintiff was in a place of peril, because he admits that when he first saw plaintiff and the girder at a distance

of 6 feet he was so startled that he put on the very effective emergency brakes with which the car was equipped. This admission is not nullified by the motorman's testimony that when he first saw him plaintiff was standing in front of the end of the girder with his back to the west. If, as it was his duty to do, he had maintained a reasonably prudent lookout within the range of his headlight, with the advantage of the arc light behind his car on the way up the grade, a warning signal from either bell or whistle would have been adequate to warn plaintiff of the car's approach; but the motorman admitted that he did not signal, although he had nearly 40 feet in which to observe plaintiff and give a warning.[3] Plaintiff, who says that as a warning to approaching streetcars he was waving a flashlight with his left hand,[4] had only a few inches to step around the end of the girder to a place of safety had he been warned.

Even if the motorman's testimony that he could not see plaintiff until he was within 6 feet of him were entitled to credence, which it is not, he would still be guilty of negligence under the rule recognized by this court in Wright v. Minneapolis St. Ry. Co. 222 Minn. 105, 115, 23 N. W. (2d) 347, 355, where we said:

"* * * After all, as we said in Anderson v. Minneapolis St. Ry. Co. 42 Minn. 490, 44 N. W. 518, *supra,* a motorman's first duty, so far as it concerns operating and managing his streetcar safely, is to the public. A motorman is guilty of negligence if he proceeds

---

[3]The majority opinion cites 2 Nellis, Street Railways (2 ed.) § 407, as authority for a rule that a motorman may assume that a workman upon the street will exercise ordinary care to look out for streetcars and get out of the way; but the cited section continues:

"* * * But, while they have the right to assume this, the servants of the company are not free from negligence in running their cars without having them under their control so that they can be readily stopped, or without giving ample warning of their approach when such notice is reasonable and prudent under the circumstances."

[4]While several passengers testified that they did not see the light from the flashlight, only one was seated where she could have seen it, and she said that she did not know where she was looking at the time.

blindly. Chicago City Ry. Co. v. Strong, 129 Ill. App. 511 (affirmed, 230 Ill. 58, 82 N. E. 335) ; Morgan v. Aroostook Valley R. Co. 115 Me. 171, 98 A. 628; Prunty v. Tyler Traction Co. 90 W. Va. 194, 110 S. E. 570; United States v. Barias, 23 Philippine 434, all *supra.*"

And in Heiden v. Minneapolis St. Ry. Co. 154 Minn. 102, 104, 191 N. W. 254, 255, where a streetcar overtook and collided with a team and wagon on a dark, rainy morning, this court said:

"* * * The motorman was not warranted in assuming that no one would be on the track, and, because of the storm and darkness, he was required to proceed with extra caution. Boyer v. St. Paul City Ry. Co. 54 Minn. 127, 55 N. W. 825. He admitted that he did not see and could not have seen the wagon until he was within 100 feet of it, and that he could not stop the car within that distance. In our opinion, the only conclusion which could be drawn from his testimony was that he was guilty of negligence. We hold that it is the duty of a motorman operating a street car after dark to have it under such control that, when the rays of the headlight enable him to discern a vehicle on the track, he can stop the car in time to avoid a collision. This rule finds support in LaPontney v. Sheddan Cartage Co. 116 Mich. 514, 74 N. W. 712; Fischer v. Michigan Ry. Co. 203 Mich. 668, 169 N. W. 819; Gilmore v. Federal Ry. Co. 153 Pa. St. 31, 25 Atl. 651, 34 Am. St. 682; Currie v. Consolidated Ry. Co. 81 Conn. 383, 71 Atl. 356; Calumet Co. v. Lynholm, 70 Ill. App. 371."

Although, as the majority states, the motorman here was not required to see "all," he was required to be extra vigilant after passing the blind spot. This was required by the circumstances.

The majority opinion states that a vehicle may reasonably be anticipated on the highway, but that in the instant case there was no reason to anticipate that plaintiff would be where he was. I have already stated that passing through a blind spot should have caused the motorman to exercise particular vigilance and that the absence of the red light should have warned him of danger to be encountered. At any rate, the rule of negligence was established by Mr. Justice

Mitchell in Christianson v. C. St. P. M. & O. Ry. Co. 67 Minn. 94, 97, 69 N. W. 640, 641:

"* * * if the act is one which the party ought, in the exercise of ordinary care, to have anticipated was liable to result in injury to others, then he is liable for any injury proximately resulting from it, although he could not have anticipated the particular injury which did happen."

As stated in 2 Nellis, Street Railways (2 ed.) § 380:

"Motormen, gripmen, and drivers operating street railroad cars are bound to be watchful at all points, elsewhere as well as at street crossings, especially in a crowded city, and to use all reasonable means to avoid accidents and injury to persons crossing the street, and to respect the equal rights of others to the use of the public streets."

The majority opinion states that a streetcar motorman has no greater duty of lookout than the operator of an automobile. In Nees v. Minneapolis St. Ry. Co. 218 Minn. 532, 537, 16 N. W. (2d) 758, 762, this court said:

"In testing acts of a motorman in the operation of a streetcar, juries and courts must necessarily take into consideration that streetcars do not have the mobility of an automobile."

Since a streetcar cannot swerve around an object in its path, the motorman must maintain a careful lookout so as to sound a warning or stop in time.

As to proximate cause, the motorman testified that the clearance between plaintiff and the streetcar was only 3 to 5 inches, a statement conclusively contradicted by the measurements given above. Even if this statement were true, it must be remembered that the front end of the car is narrower than the main body, consequently, that plaintiff was in a position of peril, even if the front end cleared him. Even if the main body of the car cleared him, any slight movement by him or any swaying of the car might bring him into contact with it.

Plaintiff was not a trespasser. He was engaged in the legitimate business of changing the bulb within the red light fixture; and, in unscrewing the nut from the bolt, which held the red lens in position, his attention had to be chiefly upon his work and could not be exclusively devoted to approaching cars. He had been changing the light in this fixture when it needed replacement for many years. It was not too much to expect of motormen that they be on the lookout and warn him of their approach. Had the motorman in this instance been maintaining such a lookout as reasonable prudence required, he would have seen plaintiff standing in the hazardous position which he occupied and would have had ample time either to stop his car or give a warning signal. Also, he was chargeable with knowledge that the type of streetcar which he was driving did not of itself give warning of its approach. It was almost noiseless, and certainly very much quieter in operation than the ordinary older type of streetcar still much in use at that time on defendant's lines.

I am of the opinion that, as a matter of law, the motorman was guilty of a lack of ordinary care, which proximately resulted in the injury to plaintiff, and that the jury should have been so instructed. I concur with the majority that plaintiff's contributory negligence was a question for the jury. For this reason, a new trial should be granted.

THOMAS GALLAGHER, JUSTICE, and FRANK T. GALLAGHER, JUSTICE (dissenting).

We concur in the dissent.